RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0183P (6th Cir.)
File Name: 03a0183p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

TIMOTHY RAY GEAN; JOHN
ERIC GREENE; CHRISTOPHER
LYNN CROSS,
     *Plaintiffs-Appellees,*

    *v.*

GEORGE W. HATTAWAY,
Commissioner of the
Tennessee Department of
Children's Services;
MARGARET DORSE, Director,
Fiscal Services, Tennessee
Department of Children's
Services; C. WARREN NEEL,
Commissioner of the
Tennessee Department of
Finance and Administration,
Individually and in their
Official Capacities,
    *Defendants-Appellants.*

No. 01-5749

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
Nos. 00-00325; 00-00701; 01-00149—Todd J. Campbell,
District Judge.

1

---

Argued: March 22, 2002

Decided and Filed: June 6, 2003

Before: BATCHELDER and CLAY, Circuit Judges;
ALDRICH, District Judge.[*]

———————————

## COUNSEL

**ARGUED:** E. Blaine Sprouse, OFFICE OF THE
ATTORNEY GENERAL, Nashville, Tennessee, for
Appellants. Theresa-Vay Smith, RURAL LEGAL
SERVICES OF TENNESSEE, INC., Oak Ridge, Tennessee,
for Appellees. **ON BRIEF:** E. Blaine Sprouse, OFFICE OF
THE ATTORNEY GENERAL, Nashville, Tennessee, for
Appellants. Theresa-Vay Smith, Lenny L. Croce, RURAL
LEGAL SERVICES OF TENNESSEE, INC., Oak Ridge,
Tennessee, Irwin B. Venick, DOBBINS & VENICK,
Nashville, Tennessee, for Appellees.

    BATCHELDER, J., delivered the opinion of the court, in
which ALDRICH, D. J., joined. CLAY, J. (p. 27), delivered
a separate opinion concurring in the outcome reached by the
majority opinion.

———————————

## OPINION

———————————

    ALICE M. BATCHELDER, Circuit Judge. In this
interlocutory appeal, the defendants challenge the district
court's denial of their motion to dismiss the plaintiffs' claims
on grounds of sovereign and qualified immunity. The district
court held that the defendants were entitled to neither

———————————

[*] The Honorable Ann Aldrich, United States District Judge for the
Northern District of Ohio, sitting by designation.

qualified nor sovereign immunity, and that all but one of the claims set forth by the plaintiffs set forth facts which, if true, could entitle plaintiffs to relief. Because the district court failed to apply the appropriate legal standard to a number of the issues raised, and in light of the Supreme Court's recent decision in *Washington State Department of Social and Health Services v. Guardianship Estate of Keffeler*, 537 U.S. ___, 123 S. Ct. 1017, 154 L. Ed. 2d 972 (2003), we reverse the judgment of the district court denying the motion to dismiss except as to those claims brought under the Rehabilitation Act against the defendants in their official capacities, and remand the case for further proceedings.

## I.

Christopher Cross, John Greene, and Timothy Ray Gean (together plaintiffs)[1] are young men who were formerly in the custody of the state of Tennessee. The defendants-appellants include George Hattaway, the Commissioner of the Tennessee Department of Children's Services (DCS), Margaret Dorse, the Director of the Fiscal Services branch of the DCS, and C. Warren Neel, the Commissioner of the Tennessee Department of Finance and Administration (together defendants). After the plaintiffs had, individually, been adjudicated delinquent by a state juvenile court, Tennessee placed them in various live-in treatment facilities. As children in state custody at residential treatment facilities with in-house schools, they were presumed disabled and therefore entitled to the benefits of the Individuals With Disabilities Education Act (IDEA) and/or the Rehabilitation Act. A variety of state and federal programs provided for the plaintiffs' maintenance, medical care, and educational needs while they were in custody, and they were therefore not personally liable for the cost of their care.

---

[1] Although each plaintiff initially brought a separate action against the defendants, the district court consolidated the three cases by order of April 4, 2001.

In addition to the benefits just described, each of the plaintiffs was entitled to receive Social Security benefits.[2] Once the plaintiffs entered state custody, DCS sought and received from the Social Security Administration the appointment of defendant Dorse as the representative payee for the purpose of receiving and managing the plaintiffs' Social Security benefits.[3] As a representative payee, Dorse (acting on behalf of DCS) was constrained to use the Social Security benefits she received only for the benefit of the plaintiffs, in accordance with the Social Security Administration's regulations and guidelines requiring a representative payee to use the funds for the current maintenance of the beneficiaries, and to hold in trust any funds not so used. DCS kept the Social Security benefits it received as representative payee in a collective account over which Dorse was the custodian, although Dorse did not have the authority to make disbursements from that account and it is not clear at this stage of the litigation whether DCS's accounting practices with regard to the Social Security benefits were proper and in accord with the Social Security Administration's regulations and policies.

DCS used the plaintiffs' Social Security benefits to reimburse the state for the cost of the plaintiffs' current maintenance. Upon leaving state custody, each plaintiff requested an accounting of his Social Security benefits. When the accounting was made, DCS offset the amount of Social Security benefits it had received for each plaintiff by

---

[2] Gean received Supplemental Security Income (SSI) under 42 U.S.C. § 1382 because of his own disability. Both Greene and Cross received Social Security Disability Insurance (SSDI) pursuant to 42 U.S.C. § 402(d)(1), because of the disability of their parents.

[3] Tenn. Code Ann. § 37-5-106(6) permits DCS to "[s]eek, apply for, receive and administer federal funds as well as any other grants or funds that can be used for children being served by the department of children's services." Regulations governing the Social Security Administration permit agencies such as DCS to act as representative payees. *See* 20 C.F.R. § 416.621(b)(7).

the amount of money the state expended for his care.  Because the state had spent far more money on each plaintiff's current maintenance than it had received in Social Security benefits on his behalf, none of the plaintiffs was able to get any money back from the state after he left its custody.[4]

The plaintiffs brought several causes of action under 42 U.S.C. § 1983, which we have grouped as follows: (1) alienation of Social Security benefits in violation of 42 U.S.C. § 407; (2) unconstitutional taking in violation of the Fifth and Fourteenth Amendments; (3) breach of fiduciary duty; (4) violation of the Equal Protection Clause of the Fourteenth Amendment; (5) denial of due process rights under the Medicaid Act; (6) violation of the right to a free, appropriate education under the Individuals with Disabilities Education Act ("IDEA"); (7) discrimination on the basis of disability in violation of the Rehabilitation Act; and (8) discrimination on the basis of disability in violation of the Americans with Disabilities Act.  Upon the defendants' motion to dismiss, the district court found that, with the exception of the discrimination claim brought under the ADA,[5] the plaintiffs stated claims upon which relief could be granted, and that neither sovereign nor qualified immunity protected the defendants from suit in this instance.  The defendants timely brought an interlocutory appeal, upon which we rule today.

---

[4] The state spent $126,939.26 for the care of Cross and received $2,526.00 in social security benefits.  J.A. 383.  The state spent $89,600.64 on Gean while receiving $17,966.00 from the SSA.  J.A. 188. For Greene the state spent $74,283.68 and received $4,064.00.  J.A. 244-45.

[5] The plaintiffs conceded before the district court that their ADA discrimination claim is barred by *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001).

## II.

In discussing the claims before us, it will be essential to address the difference between suits against state actors in their official capacities and suits against them in their individual capacities; the difference between claims brought under 42 U.S.C. § 1983 and claims brought as direct causes of action under applicable federal statutes; and how those differences affect the analysis and outcome of the motion to dismiss that is before this court.  Two of these claims—denial of due process rights under the IDEA, and discrimination on the basis of disability under the Rehabilitation Act—can be brought directly under the named federal statutes, although the plaintiffs style their claims exclusively as § 1983 actions.  Because "[t]he form of the complaint is not significant if it alleges facts upon which relief can be granted, even if it fails to categorize correctly the legal theory giving rise to the claim," *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 604 (5th Cir. 1981), we will examine the plaintiffs' claims under § 1983, and, where pertinent, directly under the federal statute in question as well.

We review *de novo* the district court's ruling on a motion to dismiss, *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003), and view all evidence and allegations presented thus far in a light most favorable to the plaintiffs.  *Pfennig v. Household Credit Servs., Inc.*, 295 F.3d 522, 526 (6th Cir. 2002).  However, it is important to remember that we accept as true only the factual allegations of the non-moving parties, and "need not accept as true legal conclusions or unwarranted factual inferences" set forth in the complaints.  *Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998).  The issues in this case are complicated, and we must be wary of accepting uncritically the plaintiffs' theories of how federal law applies to the asserted facts.

Before moving to the individual claims brought by the plaintiffs, it is helpful to review the difference between official-capacity suits and individual-capacity suits against state officials, and the implications of each.  "[D]amages

actions against public officials require[ a] careful adherence to the distinction between personal- and official-capacity suits." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). 42 U.S.C. § 1983 imposes liability upon "[e]very person who, under color of [law] of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States] . . . ." In *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989), the Supreme Court confronted the issue of whether state agents could be sued under § 1983, and held "that neither a State nor its officials acting in their official capacities are 'persons' under § 1983." The Court based this conclusion upon the fact that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," and, "[a]s such, it is no different from a suit against the State itself." *Id.*

The Court in *Will* does not remove all government actors in their official capacities from the scope of § 1983, but only those officials whose offices are considered "the State" for the purposes of an immunity analysis. *See id.* For the purposes of analysis in this case, both the Tennessee Department of Children's Services and the Department of Finance are "the State." *See* Tenn. Code Ann. §§ 4-3-101 (designating DCS and the Department of Finance & Administration, among others, as "administrative departments of state government"); 4-3-1001 (creating the Department of Finance & Administration); 4-3-1002 (giving the Commissioner of Finance & Administration "charge and general supervision" over that department); 37-5-101 (creating the Department of Children's Services); 37-5-102 (discussing how the State of Tennessee will accomplish certain purposes through DCS). To the extent, then, that the plaintiffs' claims against the defendants in this case are § 1983 claims against those persons in their official capacities, as agents of state

administrative departments, they are noncognizable.[6] The real party in interest is not the official, but the government entity whose "policy or custom . . . played a part in the [alleged] violation of federal law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (internal quotations omitted). Therefore, the need for this court to undertake a broad sovereign immunity analysis with respect to the § 1983 claims is obviated by the fact that the defendants in their official capacities are not recognized as "persons" under § 1983. Even if Tennessee's sovereign immunity has been properly waived or abrogated for the purposes of the federal statute the defendants allegedly violated, a § 1983 claim against the defendants in their official capacities cannot proceed because, by definition, those officials are not persons under the terms of § 1983.

It is important to understand the scope of *Will* in the context of suits against government officials. First, *Will* does not shield from liability public officials in their *individual* capacities, who are considered "persons" for the purposes of suits brought under § 1983, even when they are carrying out government functions. *See Hafer*, 502 U.S. at 27. Personal liability against a state official can be established under § 1983 by showing "that the official, acting under color of state law, caused the deprivation of a federal right." *Graham*, 473 U.S. at 166. Second, while *Will* removes persons acting in their official capacities on behalf of the State from the scope of § 1983 altogether, thereby eliminating the need for a court to undertake any sort of immunity analysis with respect to such a claim, state actors in their official capacities can be sued under other statutes. In defending themselves as official state actors, the sued officials can claim any immunities or defenses that would be available to the entity

---

[6]The resolution of this issue, although incorrectly cast by the defendants solely as an Eleventh Amendment issue, is necessary to our sovereign and qualified immunity analyses; it is "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). We may therefore review it at this time.

they represent. *Id.* at 167. Third, the holding in *Will* does not abrogate the doctrine of *Ex Parte Young*, 209 U.S. 123, 155-56 (1908), which allows suits against state actors in their official capacities for injunctive relief because such actions are not deemed to be against the State. *Will*, 491 U.S. at 71 n.10.

Because the § 1983 claims in this lawsuit remain against the defendants only in their individual capacities, it is necessary for the purposes of this appeal to look at the precise contours of the doctrine of qualified immunity. Qualified immunity—described by the Supreme Court as "the best attainable accommodation of [the] competing values" of deterring abuse of power by government officials and vindicating constitutional guarantees on the one hand, and preventing frivolous suits against government officials, which may dampen the ardor with which they carry out their jobs, on the other, *Harlow v. Fitzgerald*, 457 U.S. 800, 813-14 (1982)—is an affirmative defense that shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818.

A court in this circuit undertaking a qualified immunity analysis must first determine whether the plaintiff has shown a violation of a right protected by the Constitution or laws of the United States; if so, the court must examine whether the right was clearly established. *Brennan v. Township of Northville*, 78 F.3d 1152, 1154 (6th Cir. 1996). The right allegedly violated cannot be asserted at a high level of generality, but, instead, "must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987). As the Court in *Harlow* explained, the "reasonable person," in this instance, is a "reasonably competent public official [who] should know the law governing his conduct." *Harlow*, 457 U.S. at 818-19. The

official is entitled to qualified immunity unless the right allegedly violated was, at the time of the alleged violation, so clear that any reasonable public official in the defendant's position would understand that his conduct violated the right. "[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

We have established that there are two ways in which a plaintiff seeking to overcome the bar of qualified immunity can show that a right was clearly established in the law at the time the alleged violation occurred. "[A] district court within this circuit must be able to 'find binding precedent from the Supreme Court, the Sixth Circuit, or . . . itself'" that directly establishes the conduct in question as a violation of the plaintiff's rights. *Summar ex rel. Summar v. Bennett*, 157 F.3d 1054, 1058 (6th Cir. 1998). If no binding precedent is "directly on point," the court may still find a clearly established right if it can discern a generally applicable principle from either binding or persuasive authorities whose "specific application to the relevant controversy" is "so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." *Id.*; *accord Cagle v. Gilley*, 957 F.2d 1347, 1348 (6th Cir. 1992).

With these principles in mind, we turn to the specific claims raised by plaintiffs.

### III.

### A.   Alienation of Social Security Benefits

Plaintiffs allege that the defendants violated federal law by obtaining the Social Security Administration's approval of DCS as a representative payee and then using the Social Security benefits DCS received to meet expenses that were already covered by other programs. Social Security benefits are partly protected from creditors and other non-recipients by 42 U.S.C. § 407(a), which prohibits any person, including a state acting pursuant to its own laws and procedures, from

using "levy, attachment, garnishment, or other legal process" to reach the monies paid out to a Social Security beneficiary. *See Bennett v. Arkansas*, 485 U.S. 395, 397 (1988); *Philpott v. Essex County Welfare Bd.*, 409 U.S. 413, 415-16 (1973). Plaintiffs have brought their § 407(a) claims via 42 U.S.C. § 1983, presumably under the authority of *Maine v. Thiboutot*, 448 U.S. 1, 4-6 (1980), in which the Supreme Court permitted plaintiffs to use § 1983 as a means of enforcing their rights under the Social Security Act. Since, as discussed above, the plaintiffs' § 1983 claims are only viable against the defendants in their individual capacities, the issue before us is whether the plaintiffs have alleged facts that, if true, show that the defendants violated a clearly established right. If plaintiffs cannot make that showing, the defendants are entitled to qualified immunity on those claims.

The crux of this issue is whether the defendants, while serving as representative payees and in using the plaintiffs' Social Security benefits to contribute towards the cost of plaintiffs' maintenance during their time in state custody, acted in clear violation of § 407(a) and its attendant regulations. While the district court refers to several Supreme Court cases that bear indirectly on the legal question at hand, neither party to this lawsuit presented any direct and binding authority showing that the defendants breached clearly established § 407(a) rights.

After we heard oral arguments in this case, the Supreme Court addressed the issue of "whether the State's use of Social Security benefits to reimburse itself for some of its initial expenditures violates [§ 407(a)] of the Social Security Act . . . ." *Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. ____, 123 S. Ct. 1017, 1020, 154 L. Ed. 2d 972 (2003). On facts similar to those before us today, the State of Washington sought appointment to serve as the representative payee for those foster children in its custody who received Social Security benefits. *Keffeler*, 123 S. Ct. at 1022. The State, through its Department of Social and Health Services, then placed the monies it received as representative payee into "a special

Foster Care Trust Fund Account kept by the state treasurer, which include[d] subsidiary accounts for each child beneficiary," from which it reimbursed vendors who provided necessary goods and services for the children. *Id.* The Supreme Court unanimously held that Washington's policies and procedures are not prohibited by § 407(a). *Id.* at 1024-27. It then discussed how those policies are, in fact, in the best interests of the foster children whose Social Security benefits are used by the State to reimburse itself, even though the State will bear the entire cost of the children's maintenance if the children have no source of income. *Id.* at 1027-29.

Two federal courts of appeals cases from outside this circuit, *Mason v. Sybinski*, 280 F.3d 788 (7th Cir. 2002), and *King v. Schafer*, 940 F.2d 1182 (8th Cir. 1991), both decided before *Keffeler*, reach conclusions similar to those later reached by the Supreme Court. In each of those cases, patients receiving Social Security benefits and residing in state mental hospitals brought suit alleging that the state's practice of becoming the representative payee and then applying the patients' benefit payments towards the cost of their current maintenance violated § 407(a). The court in *King* concluded that "the Department's appointment as representative payee is not the result of 'other legal process' [and therefore it] . . . reject[ed] plaintiffs' claim that the Department's actions are impermissible under Supreme Court precedent." *King*, 940 F.2d at 1185. Since the Department could act as representative payee, it could "reach the plaintiffs' funds" in a way that did not violate § 407(a). *Id.* Similarly, the court in *Mason* found that the state's action of applying the benefits it received as representative payee towards the beneficiary's care falls "outside the ambit of the anti-attachment provision" of § 407(a). *Mason*, 280 F.3d at 793. *See also C.G.A. v. Alaska*, 824 P.2d 1364, 1369 (Alaska 1992) ("[S]o long as the state agency performs its duties as representative payee and spends the funds only on authorized expenses, it would not violate the prohibition on attachment found in section 407(a)'s ban on attachment.").

Not only did the plaintiffs lack a clearly established right prior to *Keffeler* to have Tennessee conserve their Social Security benefits without using any of those monies for their current maintenance, they have no such right at all now that the Supreme Court has issued its decision on the matter. Therefore, the defendants are entitled to qualified immunity on plaintiffs' claim that they violated § 407(a).

## B. Taking in Violation of the Fifth and Fourteenth Amendments

Plaintiffs allege that their property was taken for public use without just compensation, and that they were deprived of property that rightfully belonged to them in a manner "contrary to settled usages and modes of procedure, and without notice or an opportunity for a hearing," *Ochoa v. Hernandez y Morales*, 230 U.S. 139, 161 (1913), in violation of their Fifth and Fourteenth Amendments due process rights. In support of their claim, they invoke broad principles of law and note that "conserved funds" not used for current maintenance of the beneficiary are considered property of the beneficiary to be held in trust by the representative payee. 20 C.F.R. § 404.2045. The record indicates that the costs incurred by the State of Tennessee for the current maintenance of the defendants greatly exceeded the amount of Social Security benefits that DCS, as the defendants' representative payee, tendered to the State as a partial reimbursement for those costs. In other words, all of the Social Security benefits received by DCS were put towards defendants' current maintenance, and none was "conserved" in an account that could be considered property held in trust for the beneficiaries' later use.

While the Supreme Court in *Keffeler* did not directly consider a due process takings challenge to the State of Washington's use of the Social Security monies it received on behalf of the foster children in its care, the Court did allow the State of Washington to act as representative payee and reimburse itself for the care of those children, as described above. *Keffeler*, 123 S. Ct. 1017. Moreover, the Social

Security Administration's regulations appear to contemplate the payment by a state agency, as representative payee, to state-run facilities for the current maintenance and care of beneficiaries, even when their care could be paid for by another source of public funds. The "example" following § 404.2045(a) explains a situation in which benefits could be conserved by an institutional representative payee for future needs of the beneficiary. It begins as follows:

> A State institution for mentally retarded children, which is receiving Medicaid funds, is representative payee for several Social Security beneficiaries. The checks the payee receives are deposited into one account which shows that the benefits are held in trust for the beneficiaries. The institution has supporting records which show the share each individual has in the account. Funds from this account are disbursed fairly quickly after receipt for the current support and maintenance of the beneficiaries as well as for miscellaneous needs the beneficiaries may have.

20 C.F.R. § 404.2045, example.

The Administration's regulations permit state institutions to act as representative payees, and appear to endorse a situation in which the institution reimburses itself for the cost of caring for the beneficiaries. The Supreme Court's decision in *Keffeler,* considered in conjunction with the Administration's regulations, makes it clear that the defendants have not breached any established Fifth or Fourteenth Amendment right in this instance.

## C. Breach of Fiduciary Duty

Plaintiffs allege that since defendant Dorse, as representative payee, was not required to pay for their maintenance and upkeep with Social Security funds because other federal- and state-funded programs would pay for their care, to do so was a breach of fiduciary duty. DCS, via Dorse, had a duty as a fiduciary to use the funds received as a representative payee for the good of the individual

beneficiaries "in a manner and for the purposes he or she determines . . . to be in the best interests of the beneficiary." 20 C.F.R. § 404.2035(a). The question before this court, then, is whether Dorse breached a fiduciary duty clearly established under federal law by paying Social Security monies to state service providers when, had anyone other than a Tennessee state actor been the representative payee, the state would not have been able to reach the Social Security benefits and use them to pay for the plaintiffs' maintenance. We find that she did not.

The Supreme Court soundly rejected the plaintiffs' arguments on this issue, characterizing the "position . . . that allowing a state agency to reimburse itself for the costs of foster care is antithetical to the best interest of the beneficiary foster child" as a "poor fit" with § 407(a) and inconsistent with the Commissioner's interpretation of the Administration's regulations. *Keffeler*, 123 S. Ct. at 1027-28. The Court found reasonable the Commissioner's decision "that a representative payee serves the beneficiary's interest by seeing that basic needs are met, not by maximizing a trust fund attributable to fortuitously overlapping state and federal grants." *Id.* at 1028. Clearly, defendant Dorse did not breach her fiduciary duties in this instance.

### D. Violation of the Equal Protection Clause of the Fourteenth Amendment

Plaintiffs allege that defendants violated their equal protection rights by requiring them, because they received Social Security benefits, to contribute to their current maintenance costs when other juveniles in state custody who did not receive Social Security benefits were not required to make such payments (although their parents might have been required to make contributions on their behalf). Both the plaintiffs and the district court agree that this distinction implicates "no suspect class or fundamental right," and plaintiffs' equal protection claim therefore receives rational basis review: "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by

the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). The plaintiffs have the burden to negate all possible rational justifications for the distinction. *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001).

As with the plaintiffs' Fourteenth and Fifth Amendment takings claim, the Supreme Court did not address an equal protection claim in its *Keffeler* opinion; nonetheless, it gave no indication that Washington's reimbursement practices violated the beneficiaries' constitutional rights. *Keffeler*, 123 S. Ct. at 1029. In this case, the State of Tennessee has an interest in saving money and obtaining funds, where legally possible, to pay for the large number of social services it provides its residents. The plaintiffs cite to *Shapiro v. Thompson*, 394 U.S. 618 (1969), and a statement in *Saenz v. Roe*, 526 U.S. 489 (1999), for the proposition that Tennessee's interest is insufficient to justify the distinction the defendants have made in this case: "the State's legitimate interest in saving money provides no justification for its decision to discriminate among equally eligible citizens." *Saenz*, 526 U.S. at 507. We must examine, then, whether individuals such as plaintiffs, who receive Social Security benefits, and individuals who have no source of income are "equally eligible" to receive their state-provided care free of charge.

In both *Shapiro* and *Saenz*, the Supreme Court, evaluating the state's justifications under a standard stricter than "rational basis review," struck down state welfare programs that discriminated against newly-arrived state residents. *Saenz*, 526 U.S. at 504; *Shapiro*, 394 U.S. at 638. The indigent citizens who had recently moved into the state, the Court held, were as eligible to receive welfare benefits as less transient indigent citizens; to hold otherwise would restrict the constitutional right to move from state to state. *Saenz*, 526 U.S. at 504-07; *Shapiro*, 394 U.S. at 634. The Court based its rulings upon its conclusion that the state policies at issue impermissibly interfered with a citizen's right to travel under the Privileges and Immunities Clause.

In order to avoid reaching an absurd conclusion, we refuse the plaintiffs' tacit invitation to interpret the Court's statement in *Saenz* as a prohibition writ large against making distinctions among "equally eligible citizens" for the purpose of conserving state resources, particularly when the distinction drawn by the state does not affect an established constitutional right. For instance, states with a progressive income tax scheme generally require a citizen, as her income increases, to contribute a higher percentage of her earnings to the state fisc. Such a tax system distinguishes among citizens, all of whom are—in theory—equally eligible to support the state government, in order to improve the state's finances. Also, in managing social welfare programs, the state makes distinctions among its citizens based upon a sort of "ability to pay." Though a state cannot discriminate against a potential welfare recipient based upon how long that individual has been in the state, it can—and does—discriminate against that individual based upon his ability to provide for himself without state assistance. In writing that the "State's legitimate interest in saving money provides no justification for its decision to discriminate among equally eligible citizens," *Saenz*, 526 U.S. at 507, the Supreme Court plainly did not mean that an individual with the ability to pay for certain state services and an indigent individual are "equally eligible" to receive all state services and benefits free. In levying taxes and providing a broad range of social services, a state regularly makes constitutionally permissible distinctions between its citizens based upon their differing abilities to pay.

Here, Tennessee has a legitimate interest in preserving its funds, and requiring those persons with the ability to pay to contribute towards the cost of their care is a reasonable means to achieve that interest. In *Fetterusso v. New York*, 898 F.2d 322, 325 (2d Cir. 1990), the Second Circuit struck down an equal protection challenge and upheld a statute that required non-criminally committed individuals in state custody to pay for part of their care while not requiring the same of incarcerated criminals. The court concluded that the state had a legitimate purpose—preserving state finances—and that the

distinction at issue was rationally related to that goal. *Id.* at 325, 327. The court also found no violation of the Social Security Act when Social Security benefits received by the plaintiffs in that case were put towards the cost of their care, in one instance by a state hospital acting as representative payee. *Id.* at 327-28.

As with the other claims brought pursuant to 42 U.S.C. § 1983 against defendants in their individual capacities, the plaintiffs in this equal protection claim have not alleged with specificity a violation of clearly established law such that the defendants would lose their shield of qualified immunity. In fact, we note that not only have the plaintiffs failed to show that the defendants violated a clearly established right, we think it highly unlikely that they could even make a plausible equal protection argument in this case.

### E.   Denial of Due Process Rights under the Medicaid Act

While in state custody, plaintiffs were entitled to medical care under the Medicaid Act, and to a "fair hearing before the State agency" in the event that their "claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3). When (1) the Medicaid Act imposes a "binding obligation," *Livadas v. Bradshaw*, 512 U.S. 107, 132-33 (1994), on a provider; (2) the binding obligation is "intended to benefit [a] putative plaintiff," *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 509 (1990); and (3) the obligation is neither a mere statement of "congressional preference" for certain conduct nor an interest "too vague and amorphous" to be enforced by a competent judiciary, *id.*, then it is proper for those affected by that obligation to bring a suit for its breach under § 1983. *Doe ex rel. Doe v. Chiles*, 136 F.3d 709, 714 (11th Cir. 1998) (allowing plaintiff to bring a § 1983 claim to enforce § 1396a(a)(8)); *see also Concourse Rehab. & Nursing Ctr. Inc. v. Whalen*, 249 F.3d 136, 144 (2d Cir. 2001) (allowing plaintiff to bring a § 1983 claim to enforce a prior version of § 1396a(a)(13)). The right to a "fair hearing" provided to beneficiaries by § 1396a(a)(3) creates an obligation on the

part of the State and is phrased in terms of benefitting Medicaid recipients. Moreover, given that the judiciary regularly determines whether an individual has been afforded procedural due process rights, a right to a fair hearing is not so vague and amorphous that its enforcement is beyond the abilities of a competent judiciary. Therefore, it is proper for plaintiffs to bring their claim for enforcement of their Medicaid rights under § 1983.

Plaintiffs do not allege that Tennessee failed to provide them with complete and adequate medical benefits while in state care. In fact, there is no record that they even made a "claim for medical assistance" for which they could have been afforded a fair hearing. Instead, as we understand their complaint, they claim that the medical benefits they were entitled to receive at no cost under the Medicaid Act were "suspended, terminated, or reduced" when their Social Security benefits were used to contribute towards the cost of their medical care, and they never received notice of that event. Because the plaintiffs have not shown that their medical care was in any way diminished, and because they have no claim to Medicaid benefits except to cover their necessary medical care, they can show no violation of clearly established law. Moreover, to the extent that the plaintiffs intend their Medicaid claim to allege a breach of fiduciary duty—that if the defendants had utilized the plaintiffs' Medicaid benefits to pay for medical care instead of using Social Security monies, then the Social Security funds would have been preserved for the plaintiffs' benefit—we reject it. *See Keffeler*, 123 S. Ct. at 1028 (holding "that a representative payee serves the beneficiary's interest by seeing that basic needs are met, not by maximizing a trust fund attributable to fortuitously overlapping state and federal grants."). The Medicaid Act is simply not concerned with the type of harm the plaintiffs allege here. *See, e.g., Daniels v. Wadley*, 926 F. Supp. 1305, 1308 (M.D. Tenn. 1996) (holding that "TennCare enrollees need strong due process protections to protect themselves from inappropriate *denials* of health care") (emphasis added). Plaintiffs were not denied the health care to which they were entitled, and they offer no legal authority

that would permit this court to deny the defendants qualified immunity.

## F.   Right to a Free, Appropriate Education under the IDEA

The gravamen of the plaintiffs' claim under the IDEA is that the defendants abridged their right to receive free educational and related (e.g., room and board) services by using the plaintiffs' Social Security payments to contribute towards the cost of those services. The plaintiffs' IDEA claims may be brought either directly under the IDEA's own provisions for dispute resolution, or, in some circumstances, under 42 U.S.C. § 1983. *See Covington v. Knox County Sch. Sys.*, 205 F.3d 912 (6th Cir. 2000). Nonetheless, even if we read the plaintiffs' complaints liberally and treat their IDEA claims as if they were brought both under § 1983 and as a direct cause of action under the IDEA, we must determine first whether we can entertain those claims before we may examine their substance.

As we noted in *Covington*, 205 F.3d at 915, 20 U.S.C. "§ 1415(i)(2) clearly contemplates that plaintiffs will exhaust their administrative remedies before bringing a civil action to enforce their rights under the IDEA." In special circumstances in which the remedies under the administrative process would not be sufficient to make him whole, the plaintiff may bypass the IDEA's requirement of exhaustion. *Id.* at 917. "The burden in such cases, of course, rests with the [plaintiff] to demonstrate the futility or inadequacy of administrative review . . . ." *Honig v. Doe*, 484 U.S. 305, 327 (1988). In *Covington*, we held that the plaintiff met her burden because the suit was not simply for restitution of payments that would be available under the IDEA, but instead was a claim for damages arising from "infliction of emotional distress and false imprisonment" by school officials. 205 F.3d at 914, 917. We expressed no opinion regarding whether the plaintiff's claims in that case fell "within the ambit of the IDEA." *Id.* at 916. Our holding was based not upon the fact that the plaintiff sought monetary damages, but on the fact

that the IDEA did not provide a remedy for the type of harm allegedly suffered by plaintiff, which was more in the nature of a tort than a violation of a federal entitlement scheme. *Id.* at 917.

Once a plaintiff bringing an IDEA claim has exhausted her administrative remedies and filed her claim in either federal or state court, the court can "broadly determine[]" what relief is appropriate, 20 U.S.C. 1415(i)(2)(B)(iii). However, its discretion to award monetary damages under this statute extends only to restitution for money that should have been paid by the state for educational services – not to "general damages." *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370-71 (1985); *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 980 F.2d 382, 386 (6th Cir. 1992). It is when a plaintiff has a legitimate claim for "general damages" not available under the IDEA that we have been willing to allow her to bypass the administrative process detailed in that statute; "a mere claim for money damages is not sufficient to render exhaustion of administrative remedies unnecessary . . . ." *Covington*, 205 F.3d at 917.

While plaintiffs in this case have styled their claims as § 1983 actions for denial of "due process" under the IDEA, their complaint rests on the contention that their right to receive a free education was violated when some part of their Social Security benefits was used to pay for the education they received. The most appropriate type of relief, particularly given that plaintiffs are no longer in the school system, would be restitution for past payments made on their behalf to the schools and related institutions who should have provided educational and related services without charge to the plaintiffs. This is not a claim for "general damages," but a claim for a type of relief available under the IDEA. Plaintiffs have not met their burden of showing why it would be futile to pursue their IDEA claims through the administrative processes set out in that statute. Accordingly, the plaintiffs must exhaust their IDEA claims through the statutorily-prescribed administrative process before bringing them before a court.

## G.  Discrimination on the Basis of Disability in Violation of the Rehabilitation Act

Plaintiffs allege discrimination on the basis of disability, claiming that the defendants violated 29 U.S.C. § 794 by using the plaintiffs' Social Security benefits to pay for services that should have been provided to them free.[7]  An individual claiming that a recipient of federal funds has violated § 794 has the rights and remedies set forth in Title VI of the 1964 Civil Rights Act, *see* 29 U.S.C. § 794a(a)(2), including the right to bring a direct cause of action. *Alexander v. Sandoval*, 532 U.S. 275, 279-80 (2001). States that receive federal funds waive their sovereign immunity defense to claims brought against them under the Rehabilitation Act, *see* 42 U.S.C. § 2000d-7; *Nihiser v. Ohio EPA*, 269 F.3d 626 (6th Cir. 2001); *Jim C. v. United States*, 235 F.3d 1079 (8th Cir. 2000) (en banc), *cert. denied sub nom. Ark. Dep't of Educ. v. Jim C.*, 533 U.S. 949 (2001), and exhaustion of administrative remedies "is not a prerequisite to private enforcement of section [794]." *Tuck v. HCA Health Servs. of Tenn., Inc.*, 7 F.3d 465, 471 (6th Cir. 1993). We will consider this direct cause of action first.

Because 42 U.S.C. § 2000d-7 is an effective waiver of Tennessee's sovereign immunity from suit under the Rehabilitation Act, and because state officials sued in their official capacities are entitled to the defenses of the entity they represent, *Kentucky v. Graham*, 473 U.S. at 167, the defendants in their official capacities, acting as "the State," are not immune from suit.  The Rehabilitation Act claim against them in their official capacities, therefore, may proceed.  The claim brought against the defendants in their individual capacities is subject to the defense of qualified immunity, which we shall explain below.

---

[7]In pertinent part, § 794 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."

We must determine as well whether, in addition to bringing their claims directly under the Rehabilitation Act, plaintiffs may also bring their claims for violation of that statute under § 1983. Federal rights may be vindicated by § 1983, *Maine v. Thiboutot*, 448 U.S. 1, 4-5 (1980) ("the § 1983 remedy broadly encompasses violations of federal statutory as well as constitutional law"), unless "the statute does not create 'enforceable rights, privileges, or immunities within the meaning of § 1983,' [or unless] 'Congress has foreclosed such enforcement of the statute in the enactment itself.'" *Lochman v. County of Charlevoix*, 94 F.3d 248, 250 (6th Cir. 1996) (quoting *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 508 (1990)). Congress is presumed to have foreclosed § 1983 enforcement of a given statute by creating "sufficiently comprehensive" remedial devices in the Act itself. *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 19-20 (1981).

The law in the Sixth Circuit is not settled regarding whether Rehabilitation Act claims are properly brought pursuant to § 1983. *See Pendleton v. Jefferson Local Sch. Dist. Bd. of Educ.*, No. 91-3126, 1992 WL 57421, at *7-8 (6th Cir. March 25, 1992) (holding that the Rehabilitation Act and § 1983 are not mutually exclusive remedies). *But see Tyus v. Ohio Dep't of Youth Servs.*, 606 F. Supp. 239, 243-46 (S.D. Ohio 1985) (holding that § 1983 does not add to the rights a plaintiff already has under the Rehabilitation Act, and cannot be used to circumvent the administrative procedures set forth in that act). Moreover, federal courts outside of this circuit are not in agreement as to whether Congress intended the remedies available under the Rehabilitation Act to preclude a suit brought under § 1983 to enforce rights created by the Rehabilitation Act. *See, e.g.*, *Smith v. Barton*, 914 F.2d 1330, 1335 (9th Cir. 1990) (noting that it is a "matter of some disagreement" between courts whether Congress intended to preclude § 1983 claims by the remedial scheme of the Rehabilitation Act); *Alexander v. Chicago Park Dist.*, 773 F.2d 850, 856 (7th Cir. 1985) (holding that the comprehensive enforcement provisions of Title VI, which also apply to § 794, preclude action under § 1983); *Becker v. Oregon*, 170 F.

Supp. 2d 1061, 1069-70 (D. Or. 2001) (allowing § 1983 claims to vindicate Rehabilitation Act rights); *Veal v. Memorial Hosp.*, 894 F. Supp. 448, 454 (M.D. Ga. 1995) (holding that Congress intended § 794's remedies to preclude § 1983 actions, but only to the extent that the § 1983 action was brought to enforce rights already protected by the statutory scheme); *Doe v. Dist. of Columbia*, 796 F. Supp. 559, 571-72 (D.D.C. 1992) (abstaining from examining plaintiff's Rehabilitation Act claims under § 1983 because the remedies under § 1983 are the same as those available in a direct action); *Rothschild v. Grottenthaler*, 716 F. Supp. 796, 801 (S.D.N.Y. 1989) (characterizing the Rehabilitation Act's remedial scheme as not so comprehensive that it would preclude a § 1983 action); *Shuttleworth v. Broward County*, 639 F. Supp. 654, 659 (S.D. Fla. 1986) (listing further authorities). Because, as we explain below, a § 1983 claim to enforce the plaintiffs' rights under the Rehabilitation Act is barred by qualified immunity in this case and therefore has no chance of success even if it is not precluded by the remedial scheme of the Act, we need not pick a side in that debate.

As we have already explained, section 1983 claims are not cognizable against a state or its agents acting in their official capacities. *Will*, 491 U.S. at 71. These defendants in their individual capacities have asserted the defense of qualified immunity, which plaintiffs may overcome only by showing that the rights the defendants allegedly violated were specifically and clearly established in law such that no reasonably competent official in their position would have had any doubt that he was breaking the law. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The plaintiffs, however, fail to allege that the defendants' use of plaintiffs' Social Security benefits to pay for part of their current maintenance "excluded [them] from the participation in, . . . denied [them] the benefits of, or . . . subjected [them] to discrimination under any program or activity" on the basis of their disability. 29 U.S.C. § 794(a). Rather, as with their claim under the Medicaid Act, their Rehabilitation Act claim alleges discrimination only in highly general terms. In order to overcome the defense of qualified immunity, the plaintiffs

must show that the right allegedly violated was "clearly established in a more particularized . . . sense," *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), which they have wholly failed to do.

Therefore, the plaintiffs may proceed directly under the Rehabilitation Act against the defendants in their official capacities, but plaintiffs' § 1983 claim against the defendants in their individual capacities, were that claim allowed to proceed, would be barred by qualified immunity.

### IV.

Finally, in ruling on this motion to dismiss, our only functions are to examine whether plaintiffs have alleged facts that, if true, would be grounds for relief, and to ascertain whether the immunity defenses asserted by defendants preclude the advancement of any of the plaintiffs' legal claims. In an attempt to allow us to reach the merits of their claims, plaintiffs plead their case as one for injunctive relief. Their complaint is, however, based entirely upon past acts and not continuing conduct that, if stopped, would provide a remedy to them, and it therefore does not come under the doctrine of *Ex Parte Young*, 209 U.S. 123, 155-56 (1908). *See Covington*, 205 F.3d at 917 n.7 (stating that the court would read plaintiff's complaint as one for damages only, despite a request for injunctive relief, because "[plaintiff] has not filed a class action, nor has she demonstrated any other basis upon which she should be entitled to assert the rights of other public school students to relief that would not affect [the injured party].").

Moreover, because DCS used all of plaintiffs' Social Security payments for their current maintenance, no monies belonging to the defendants are being held in trust by the State of Tennessee. Any remedy in this suit would have to come from the Tennessee treasury, and suits against the state fisc seeking restitution for past damages are barred by the Eleventh Amendment. *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). Only with respect to the plaintiffs' claim brought under the Rehabilitation Act against the defendants in their

official capacities—for which sovereign immunity has been waived—may this suit go forward. We will remand that claim to the district court for disposition on the merits and the determination of what remedy (if any) is appropriate in light of established law and the principles we have articulated above.

### V.

For the foregoing reasons, we REMAND to the district court the plaintiffs' Rehabilitation Act claim against the defendants in their official capacities. We dismiss all of the other claims against the defendants in both their official and individual capacities.

—————————————

## CONCURRENCE

—————————————

CLAY, Circuit Judge, concurring. I concur in the outcome reached by the majority opinion, but write separately to emphasize that my concurrence is compelled by the Supreme Court's holding in *Washington State Dep't of Social & Health Services v. Guardianship Estate of Keffeler*, 537 U.S. ___, 123 S. Ct. 1017 (2003), as to Plaintiffs' claims brought under the Social Security Act.

I also write separately to emphasize that while I agree with the majority opinion's outcome as to Plaintiffs' claims brought under the Equal Protection Clause, I disagree with the majority's language and discussion related to this claim. Specifically, I do not concur in the majority opinion's discussion of the Supreme Court's statement in *Saenz v. Roe*, 526 U.S. 489, 507 (1999), as to whether "the State's legitimate interest in saving money provides no justification for its decision to discriminate among equally eligible citizens." That is, I do not join the majority opinion's language and related discussion to the effect that "[t]hough a state cannot discriminate against a potential welfare recipient based upon how long that individual has been in the state, it can—and does—discriminate against that individual based upon his ability to provide for himself without state assistance." I decline to join that portion of the majority opinion's language because I believe it to be at variance with the import and holding of *Shapiro v. Thompson*, 394 U.S. 618 (1969), *Saenz v. Roe*, 526 U.S. 489 (1999), and a plethora of Supreme Court pronouncements in the area of equal protection.