56 A.3d 250

**In re RYAN W.**

**No. 1503, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Nov. 21, 2012.

700

Julia D. Benhardt (Hilma J. Munson, Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellant.

Ramesh Kasarabada (Legal Aid Bureau, Inc., on the brief) Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., WOODWARD,
LAWRENCE F. RODOWSKY (Retired, Specially Assigned),
JJ.

## ON MOTION FOR RECONSIDERATION

EYLER, DEBORAH S., J.

This appeal concerns the right of a local department of social services acting as a representative payee for social security survivor benefits for a child committed to its care to use those benefits to reimburse itself for the cost of the child's care. The Baltimore City Department of Social Services ("the Department"), the appellant, acting as representative payee for Ryan W., the appellee, received $31,693.30 in Social Security Old Age, Survivor, and Disability Insurance ("OASDI") benefits for Ryan. The Department applied all of those benefits to reimburse itself for a portion of the direct cost of foster care services it paid on Ryan's behalf over a three and one-half year period. By the end of that period, the direct costs of foster care services for Ryan totaled $233,305.51.

After the benefits were paid, Ryan filed a "motion to control conduct" in his Child In Need of Assistance ("CINA") case, in the Circuit Court for Baltimore City, challenging the Department's application of his OASDI benefits. In the motion, Ryan asked the Juvenile Court to order the Department to "conserve" in a trust account the entire $31,693.30 in OASDI benefits it had received, to be used for his benefit when he leaves foster care.

After holding two hearings, the Juvenile Court ruled that the Department had violated Ryan's due process and equal protection rights by applying the OASDI benefits it had received on his behalf as it did; declared void two COMAR regulations purporting to authorize the Department's actions in this case; and found, as a matter of fact, that the OASDI benefits were not applied in a manner consistent with Ryan's best interests. The court granted the relief sought by Ryan, ordering the Department to place in a trust account, subject to

court supervision, the full $31,693.30 in OASDI benefits it had received as Ryan's representative payee.

The Department noted an appeal, presenting three questions for review, which we have rephrased slightly:

I.   Did the Department lawfully apply for and use Ryan's OASDI benefits for the cost of his foster care?

II.  Does a Juvenile Court have authority to declare a Maryland regulation invalid, to supervise a local department of social services' activities as representative payee for a foster child's OASDI benefits, and to mandate the creation and funding of a trust account as a remedy for a local department's alleged prior misuse of those benefits?

III. Does sovereign immunity bar the Juvenile Court from ordering the Department to establish and maintain a trust account for Ryan with funds from the State Treasury?

In the proceedings below, counsel for the Department conceded that $8,075.32 in OASDI benefits that it received for Ryan should not have been used for the cost of Ryan's care, and had to be reimbursed by the Department to Ryan's Foster Care Trust Account. During the pendency of this appeal, in December 2011, the Department deposited $7,478.32 into Ryan's Foster Care Trust Account, to make up for the sum the Department had conceded it should not have used to reimburse itself for the cost of Ryan's care.[1]

Ryan has moved to dismiss the appeal or, in the alternative, to strike certain portions of the Department's brief.

For the reasons to follow, we shall deny the motion to dismiss, reverse the order of the Juvenile Court, and direct

---

1.  This Court was not informed of this reimbursement until October 3, 2012, when the Department filed a motion for reconsideration of our September 5, 2012 opinion in this case and to recall the mandate that was issued on September 26, 2012. (The mandate had been issued prematurely.) The Department furnished with the motion for reconsideration an affidavit from its Assistant Director of Finance attesting to the reimbursement. We shall discuss this in greater detail *infra*.

the Juvenile Court to order the Department to deposit $660 in Ryan's Foster Care Trust Account. We also shall deny Ryan's motion to strike certain portions of the Department's brief.

## STATUTORY AND REGULATORY FRAMEWORK

### A. Old Age, Survivor, and Disability Insurance Benefits and Representative Payees

Title II of the Social Security Act, 42 U.S.C. 401 *et seq.*, establishes the framework for OASDI, which is a cash benefit paid to elderly and disabled workers, and their survivors and dependents. In the instant case, we are concerned only with OASDI *survivor's* benefits. An unmarried child under the age of 18 (or 19 if attending school full time) who is a surviving dependent of a deceased parent is entitled to receive OASDI benefits if the deceased parent earned sufficient work credits during his or her lifetime. 42 U.S.C. § 402(d). The amount of the child's benefit is based on the earnings of the deceased parent. *Id.*

Ordinarily, OASDI benefits are paid directly to the beneficiary. The Social Security Administration ("SSA") may pay the benefits to a "representative payee," however, if doing so will serve the interests of the beneficiary. 42 U.S.C. 405(j)(1)(A); 20 C.F.R. 404.2001 (SSA selects a representative payee if it is "in the interest of a beneficiary" to do so). Except in certain limited circumstances that do not apply here, when a beneficiary is under the age of eighteen, as is usually the case with beneficiaries of survivors' benefits, the SSA pays OASDI benefits to a representative payee. 20 C.F.R. 404.2010(b).[2]

---

2. The SSA may pay benefits directly to a minor beneficiary if: 1) the minor is receiving disability payments based on his own earning record; 2) the minor is in the military; 3) the minor is living alone and is self-supporting; 4) the minor is a parent and is filing for benefits for him/herself and/or his/her child *and* has experience handling finances; 5) the minor is capable of using the benefits to meet his/her needs *and* no other payee is available; or 6) the minor is within seven months of

SSA regulations provide that the SSA shall choose a representative payee who will best serve the interests of the beneficiary. The regulations establish an order of priority for selection of a representative payee for a minor child:

(1) A natural or adoptive parent who has custody of the beneficiary, or a guardian;

(2) A natural or adoptive parent who does not have custody of the beneficiary, but is contributing toward the beneficiary's support and is demonstrating strong concern for the beneficiary's well being;

(3) A natural or adoptive parent who does not have custody of the beneficiary and is not contributing toward his or her support but is demonstrating strong concern for the beneficiary's well being;

(4) A relative or stepparent who has custody of the beneficiary;

(5) A relative who does not have custody of the beneficiary but is contributing toward the beneficiary's support and is demonstrating concern for the beneficiary's well being;

(6) A relative or close friend who does not have custody of the beneficiary but is demonstrating concern for the beneficiary's well being; and

*(7) An authorized social agency or custodial institution.*

20 C.F.R. 404–2021(c) (emphasis added).

Once the SSA has selected a representative payee, it notifies the beneficiary in writing prior to issuance of the first benefit payment. 42 U.S.C. 405(j)(2)(E)(ii); 20 C.F.R. 404.2030(a). When the beneficiary is a minor child, however, the notice is directed to the child's legal guardian or legal representative. *Id.* The notice advises the beneficiary, *inter alia*, that he or she has a right to appeal the determination that representative payment is necessary and designation of the particular representative payee. *Id.*

---

attaining majority and filing an initial application for benefits. 20 C.F.R. 404.2010(b).

The responsibilities of a representative payee are delineated by 20 C.F.R. 404.2035. That regulation provides, in pertinent part, that a representative payee shall "[u]se the benefits received on [ ] behalf [of a beneficiary] only for [the beneficiary's] use and benefit in a manner and for the purposes he or she determines, under the guidelines in this subpart, to be in [the beneficiary's] best interests." 20 C.F.R. 404.2035(a).

Pursuant to 20 C.F.R. 404.2040(a), payments made by a representative payee are for the "use and benefit" of the beneficiary if the benefits are "used for the beneficiary's current maintenance." "Current maintenance includes cost incurred in obtaining food, shelter, clothing, medical care, and personal comfort items." *Id.* The regulation provides the following illustration:

> *Example:* An aged beneficiary is entitled to a monthly Social Security benefit of $400. Her son, who is her payee, disburses her benefits in the following manner:

| Rent and utilities | $200 |
|---|---|
| Medical | 25 |
| Food | 60 |
| Clothing (coat) | 55 |
| Savings | 30 |
| Miscellaneous | 30 |

The above expenditures would represent proper disbursements on behalf of the beneficiary.

The regulation further provides that, when a beneficiary is institutionalized "because of a mental or physical incapacity," the "customary charges" of the institution may constitute "current maintenance." *Id.* at (b). Expenditures for costs falling outside of those customary charges also would be allowed, however, even if the benefits would not otherwise cover the cost of the institution's charges.[3]

---

**3.** By way of example, the regulation sets forth a scenario in which an institutionalized beneficiary is charged $700 per month for room and board. He receives just $320 a month in social security benefits. His brother, not the institution, is his representative payee. Ordinarily, the representative payee pays over to the institution $295 of the monthly benefit, reserving $25 for the beneficiary's personal needs. One month, however, the representative payee learns that the beneficiary needs a

Finally, the regulation provides that a representative payee may not be required to use benefits to cover a debt of a beneficiary that arose prior to the date on which an OASDI payment was certified to the beneficiary. *Id.* at (d). For example, if a beneficiary receives a lump sum retroactive benefit payment certified in 2010, and that beneficiary had an outstanding bill for costs incurred in a nursing home in 2009, the representative payee must first ensure that the beneficiary's current maintenance needs are met. If those needs are met and excess benefits remain, the representative payee can use the lump sum benefit or a part of it to pay the outstanding bill.

After a representative payee has provided for the beneficiary's current maintenance and other permissible uses as discussed above, "any remaining amount shall be conserved or invested on behalf of the beneficiary." 20 C.F.R. 404.2045(a).

## B. Maryland statutes and regulations

Pursuant to Md.Code (2006 Repl.Vol., 2010 Supp.), section 5–524 of the Family Law Article ("FL"), the Department of Human Resources ("DHR") shall provide "child welfare services" to a child placed in foster care who cannot return to his or her parents and/or guardians. DHR shall "develop and implement" a permanent placement for the child. *Id.* In carrying out these duties, DHR "shall provide for the care, diagnosis, training, education, and rehabilitation of children by placing them in group homes and institutions that are operated by for-profit or nonprofit charitable corporations." FL § 5–526(a). DHR shall reimburse the for-profit or non-profit corporations that operate the group homes at "appropriate monthly rates that DHR determines, as provided in the State budget." *Id.* at § 5–526(b).

---

new pair of shoes. He takes him to a store to buy shoes for $29, takes him to a movie for $3 and gives him $3 to use at the institution canteen. As a result, the institution receives $10 less that month. The SSA would consider all of these expenditures to be proper. *Id.*

DHR has promulgated regulations respecting out-of-home placements for foster children. As relevant here, COMAR 07.02.11.29, entitled "Child Support and Other Resources for Reimbursement Towards Cost of Care," governs the means by which a local department may seek reimbursement for costs incurred in caring for a foster child in an out-of-home placement. At part A, the regulation states that

> [a]ll of [a foster] child's resources, including parental support, *the child's own benefits,* insurance, cash assets, trust accounts, and, for the child who is preparing for independent living, the child's earnings, are considered, as established in the service agreement, in determining the amount available for reimbursement of the cost of care.

(Emphasis added.) The "cost of care" includes "the board rate, clothing allowance, any medical care payments made on behalf of the child, and any supplemental purchases made to meet the child's special needs." 07.02.11.29.B. The primary resource for reimbursement of the cost of care is child support; and, unless parental rights have been terminated, the local department is obligated to pursue support enforcement proceedings against parents of foster children. 07.02.11.29C–I. A foster child's own earnings also may be considered a resource for reimbursement "in a manner consistent with a plan for the child to eventually assume responsibility for the child's support as provided for in the service agreement." 07.02.11.295.

Part K of the regulation pertains to "Other Resources for the Child." It states that "survivor's disability insurance," *i.e.,* OASDI benefits, may be considered a resource for a child in an out-of-home placement. 07.02.11.29K(1) ("Other resources available for the child may be in the form of cash assets, trust accounts, insurance (including survivor's disability insurance), or some type of benefit or supplemental security income for the disabled child." A child over age 18 in an out-of-home placement who is eligible for OASDI benefits may choose either to pay the benefits over to the local department or to designate the local department as the representative payee for the benefits. 07.02.11.29K(2).

Part L of the regulation governs how the local department shall apply a child's resources, including OASDI benefits:

The child's resources shall be applied directly to the cost of care, with any excess applied first to meeting the special needs of the child, and the net excess saved in a savings account for future needs. Any potential benefits from other resources shall be pursued and made available if possible to the local department as payee.

3107.02.11.29C. Finally, Part M is implicated when the local department has conserved a "net excess" in resources for a child and the child is discharged from out-of-home placement:

If excess funds saved for the child have not been spent before the child is discharged from out-of-home placement, the funds shall be:

(1) Returned to the child upon discharge if the child is 18 years old or older;  or

(2) If the child is younger than 18 years old, transferred to the legal parent or guardian with whom the child will reside.

07.02.11.29M.

## FACTS AND PROCEEDINGS

Ryan was born on February 26, 1993, to Mary W. and Gregory M. He is now 19 years old.

In 2002, Ryan was removed from his parents' care, based upon allegations of neglect. Both of his parents were active drug addicts.[4] On June 4, 2002, when he was 9 years old, Ryan was adjudicated a CINA by the Circuit Court for Baltimore City acting as the Juvenile Court, and was committed to the care and custody of the Department. Since that time, Ryan

---

**4.** Ryan's siblings also were removed from the parents' care as well. His sister Kelly later was adopted by non-relatives and moved out-of-state. Ryan has no contact with her. He sees his sister Leah "occasionally." The record does not reflect the age of either sister.

Ryan's older brother, whose name we cannot discern from the record, died in November of 2010.

has remained committed to the Department and has lived in various out-of-home, non-relative placements.

Ryan's mother died in August of 2006. Two years later, in November of 2008, his father died.

Beginning in April of 2009, Nathan Exom became (and remains) the Department caseworker assigned to Ryan. In June of 2009, Exom provided copies of Ryan's parents' death certificates to the Department's Foster Care & SSI Reimbursement Unit ("Reimbursement Unit").[5] In November of 2009, the Reimbursement Unit applied to the SSA for OASDI benefits on Ryan's behalf and asked to be appointed as his representative payee. On a date soon thereafter, but not revealed by the record, Ryan's application was approved by the SSA, which appointed the Department to serve as his representative payee.

In December of 2009, the Department began receiving, in its capacity as representative payee, $771 per month in OASDI benefits for Ryan. The first monthly payment was for the month of November of 2009. The Department also received two lump sum payments for retroactive OASDI benefits for Ryan. The first lump sum payment, received on November 13, 2009, was for $8,481, and covered the period from December of 2008 to October of 2009, i.e., between Ryan's father's death and the commencement of OASDI benefit payments. The second lump sum payment, received on December 15, 2009, was for $11,647.50, and covered the period from August 2006 to November 2008, i.e., from the time Ryan's mother died until his father died. The Department continued to receive monthly OASDI benefits on Ryan's behalf until Ryan turned 18 in February of 2011. Over the entire time that the Department acted as Ryan's representative payee, it received a total of $31,693.50 in OASDI benefits (lump sum and monthly) on his behalf. It applied all of the benefits toward the cost of Ryan's foster care.

---

5. Exom investigated whether Ryan was eligible for survivor's benefits after receiving a Department memorandum regarding the Department's practice of applying for OASDI benefits on behalf of foster children.

## A. Ryan's Motion to Control Conduct

In March of 2011, Ryan, through his CINA counsel, contacted Exom to determine if the Department had received any OASDI benefits on his behalf. The Department gave Ryan an accounting of his OASDI benefits that had been received and disbursed by the Department over the period of time in which it had acted as representative payee.

On April 5, 2011, in his CINA case, Ryan filed a "motion to control conduct" under Md.Code (2006 Repl.Vol., 2010 Supp.), section 3–821 of the Courts and Judicial Proceedings Article ("CJP").[6] He asked the Juvenile Court to order the Department to "conserve the [OASDI] benefits [the Department] surreptitiously applied for on his behalf and ha[d] been receiving as his representative payee since 2009" and to "maintain" all of the benefits "collected and to be collected in a separate account" in his name. He asserted that the Juvenile Court had jurisdiction over the matter pursuant to CJP section 3–803(b)(i), as the matter concerned "support" for him and the dispute was not preempted by federal law.[7]

---

6. That section, entitled "Order controlling conduct of person before court," states:

   (a) *In general.*—The court, on its own motion or on application of a party, may issue an appropriate order directing, restraining, or otherwise controlling the conduct of a person who is properly before the court, if the court finds that the conduct:

   (1) Is or may be detrimental or harmful to a child over whom the court has jurisdiction;

   (2) Will tend to defeat the execution of an order or disposition made or to be made under this subtitle; or

   (3) Will assist in the rehabilitation of or is necessary for the welfare of the child.

   (b) *Application to person not party to petition.*—Subsection (a) of this section shall apply to a person not a party to the petition if the person is given:

   (1) Notice of the proposed order controlling the person's conduct; and

   (2) The opportunity to contest the entry of the proposed order.

   (c) *Enforcement.*—An order issued under this section is enforceable under Title 15, Chapter 200 of the Maryland Rules.

7. CJP section 3–803(b)(i) provides that the Juvenile Court has concurrent jurisdiction over "[c]ustody, visitation, support, and paternity of a child whom the court finds to be a CINA."

On May 16, 2011, the Department filed an opposition to Ryan's "motion to control conduct," arguing that the Juvenile Court lacked jurisdiction to decide the matter and maintaining that the Department's actions as representative payee had been proper under governing federal and state law.

In the interim, by letter dated April 30, 2011, Ryan filed a notice of claim with the State Treasurer pursuant to the Maryland Tort Claims Act ("MTCA"), Md.Code (2009 Repl. Vol., 2010 Supp.), section 12–101 *et seq.* of the State Government Article ("SG"). The letter was received on May 3, 2011. In the letter, Ryan asserted · that the Department, in its capacity as representative payee, had violated its fiduciary duty to him by using his OASDI benefits to reimburse itself for the cost of his care; that this practice had violated his rights under the Maryland Declaration of Rights and the federal constitution; and that the COMAR regulations purporting to authorize the practice were promulgated in violation of the Maryland Administrative Procedure Act.

### B. The First Hearing

On May 17, 2011, the Juvenile Court held an evidentiary hearing on the "motion to control conduct." Counsel for the Department argued at the outset that the court lacked jurisdiction to consider the motion. The court made clear that it intended to "make a complete record" before ruling on the issue of jurisdiction.

Ryan testified on his own behalf. He explained that he currently lives in the home of one Mr. B., in the Phoenix area of Baltimore County, and attends Dulaney High School, where he was about to finish 11th grade. He had been living with Mr. B. for two to three weeks. Before then, he had spent the most recent 9 months living at All Star Flight Enterprises, Inc. ("Star Flight"), a therapeutic group home in Pikesville. Prior to that placement, he had spent seven months at Dream Keepers, a therapeutic group home in Baltimore City; two to three months at Franklin Homes ("Franklin"), a non-thera-

peutic group home in Baltimore City; seven to eight months in a foster home in Bel Air; and another year at Franklin.[8]

Ryan testified that he had not known that the Department had applied for or was receiving OASDI benefits on his behalf. He asserted that, had he received the benefits directly, he would have invested the funds "in stock." Finally, Ryan testified that until his CINA counsel requested it, he had never received an accounting of his OASDI benefits and their use.

In response to questions from the court, Ryan testified about his plans for his future. He said he wants to be a park ranger and is thinking about attending college. He had done some preliminary research and was interested in Garrett College, in western Maryland, which offers a forestry program.

The Department called as a witness Georgette Griffith, a manager with the Reimbursement Unit. She testified that her unit is responsible for applying for OASDI benefits for children in the care and custody of the Department and using the benefits for the cost of the children's care, and that it is not her unit's practice to notify the child when it applies for or uses OASDI benefits. She testified that the Department had received a total of $31,693.50 in OASDI benefits on Ryan's behalf. She was unaware whether Ryan's cost of care also was covered by Title IV E funds.[9] Griffith had not met Ryan and was not familiar with his case.

The Department also called Exom. He testified that Ryan was not Title IV E eligible and therefore the cost of his care was paid for directly with Department funds.

---

8. The time line provided by Ryan conflicts in certain respects with the testimony of Exom at a later hearing.

9. Title IV–E refers to the Adoption Assistance and Child Welfare Act of 1980. It is a "cooperatively run federal-state program through which the federal government provides participating states with funding to advance the adoption of special needs children." *Greenfield v. Fl. Dep't of Children & Family Servs.,* 794 So.2d 739, 740 (Fla.Dist.Ct.App.2001).

The Department introduced into evidence an accounting of all of the OASDI benefits received on behalf of Ryan during the period in which it acted as his representative payee (November of 2009 through February of 2011) and the lump sum retroactive payments received. It further detailed the amount expended by the Department for the cost of Ryan's care each month during this period. The accounting revealed that the Department expended $93,199.49 for Ryan's care between August of 2006 and November of 2008 (the period covered by the second received lump sum check); $57,897.86 between December of 2008 and October of 2009 (the period covered by the first received lump sum check); and that it had expended $72,208.16 in the 15 months since it began receiving current benefit payments. Thus, the Department expended $223,305.51 for Ryan's care during the three and one-half year period of time for which it received benefits payments on Ryan's behalf.

At the conclusion of all the evidence, the Juvenile Court heard argument of counsel and then advised the parties the matter would be held *sub curia.*

## C. The June 16, 2011 Opinion and Order.

On June 16, 2011, the Juvenile Court issued a memorandum opinion and order.[10] In the order, the court made the following findings:

1. [The Department's] practice of applying [Ryan]'s [OASDI] benefits toward the cost of his foster care without notice to [him], or opportunity to be heard on the matter violate[d] [Ryan]'s due process rights;

2. [The Department]'s practice violate[d Ryan]'s equal protection rights;

---

10. The record includes an "Opinion and Order" dated June 16, 2011. That document actually is a 23–page memorandum opinion. There also exists a June 17, 2011 "Order," which states that it is "NUNC–PRO–TUNC to 6/16/2011." We treat both as having been entered on June 16, 2011.

3.   COMAR 07.02.11.29(K)(2) and (L) are nullified because these regulatory sections exceed the statutory authority granted to [the Department];

4.   COMAR 07.02.11.29(K)(2) and (L) violate [the Department's] fiduciary duty to [Ryan]; and

5.   [The Department]'s actions in this case have not been shown to be in the best interests of [Ryan].

The order directed that the "matter shall be set in for a permanency planning review on July 15, 2011," at which hearing the Department would be required

to address a) whether its past actions in reimbursing itself were in the best interests of [Ryan] and b) if the Court should conclude that self reimbursement was not in the best interests of [Ryan], [the Department] shall be prepared to state what the proper use of the $31,693.30 [sic] with which it has reimbursed itself should now be, given the current age and circumstances of [Ryan].

The order further provided that, if the Department still was Ryan's representative payee as of the time of the July 15, 2011 hearing, it would be obligated to present a plan for the future use of OASDI benefits to be received on Ryan's behalf; and the court would determine whether the proposed use would be in Ryan's best interest.[11]   Finally, the order afforded Ryan the opportunity at the July 15, 2011 hearing to challenge the Department's proposed use of any past or current OASDI benefits and advised that either party could submit written memoranda on the issues by July 11, 2011.

In its attached memorandum opinion, the Juvenile Court first addressed the Department's jurisdictional challenges. The Department had argued that the Juvenile Court lacked jurisdiction to make rulings about Ryan's OASDI benefits because Ryan had failed to exhaust federal and state administrative remedies; a Juvenile Court does not have subject matter jurisdiction to issue an order controlling the conduct of

---

11.  As mentioned, the Department no longer was acting as Ryan's representative payee as of February 2011.

the Department in expending a child's OASDI benefits; Ryan's filing of an MTCA notice of claim deprived the Juvenile Court of whatever jurisdiction it might have had to begin with; and the separation of powers doctrine barred the relief sought. The Juvenile Court rejected those arguments. It reasoned that because receipt of notice of the agency action is the triggering event for an administrative appeal, and the Department never notified Ryan that it was applying for OASDI benefits on his behalf, that it had been designated as his representative payee, or that it was receiving and using the benefits, Ryan could not have been required to exhaust administrative remedies.

On the issue of subject matter jurisdiction, the Juvenile Court ruled that it has broad authority and power to protect and advance the best interest of a CINA, and that that jurisdiction extends to the "custody, visitation, *support*, and paternity" of the child. CJP § 3–803(b)(1). (Emphasis added.) The court concluded that its deciding the "motion to control conduct" would not violate the separation of powers doctrine because the Department's actions as representative payee for a foster child were undertaken in its capacity as Ryan's guardian and fiduciary, and the Juvenile Court has broad, proactive responsibilities to oversee the Department's conduct in that respect. Finally, the Juvenile Court rejected the argument that Ryan's filing of an MTCA notice of claim with the State Treasurer had preclusive effect.

Turning to the substantive issues, the Juvenile Court first addressed the impact of the Supreme Court's holding in *Washington State Department of Social and Health Services v. Guardianship Estate of Danny Keffeler*, 537 U.S. 371, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003) (*"Keffeler II "*). It concluded that the *Keffeler II* decision, which we shall discuss later in more detail, held only that a local department of social services does not run afoul of the anti-attachment sections of 42 U.S.C. section 407(a) when it uses a foster child's OASDI benefits to reimburse itself for the cost of the child's care. The Juvenile Court ruled that, because Ryan did not challenge

the Department's actions under the anti-attachment provisions, *Keffeler II* did not control.

The Juvenile Court next addressed Ryan's argument that the Department's practice of applying for OASDI benefits on behalf of a minor foster child, seeking appointment as representative payee, and using the benefits received as representative payee to reimburse itself for the cost of care of the foster child without giving the child notice violated the child's due process rights under the 5th and 14th Amendments to the United States Constitution and Article 24 of the Maryland Declaration of Rights. It concluded that this practice involved governmental action and that OASDI benefits are a property interest. On the question whether Ryan received adequate notice and an opportunity to be heard, the Juvenile Court looked to the sections of the Social Security Act that require the SSA Commissioner to provide notice to a beneficiary whenever a representative payee is designated. As discussed above, under those sections and the regulations thereto, when the OASDI beneficiary is under the age of 18, the notice shall be sent to the beneficiary's legal guardian or "legal representative." *See* 42 U.S.C. § 405(i)(2)(E). The notice informs the beneficiary of his or her right to contest the designation of the representative payee. The Juvenile Court decided that, although notice to the Department, as Ryan's legal guardian, was technically sufficient under the SSA regulations, the Department should have notified Ryan's CINA counsel as well; and its failure to do so deprived Ryan of an opportunity to "challenge the appointment of [the Department] as the representative payee, to be heard as to what his best interests are, or to challenge the propriety of any expenditures."

The Juvenile Court went on to rule that the Department's practices violated Ryan's rights under the equal protection clauses of the federal and Maryland constitutions. It opined that, by using OASDI benefits for self-reimbursement, the Department created "a substantial and arbitrary distinction between children whose families become representative payees and those for whom [the Department] becomes the representative payee." To illustrate the point, the Juvenile Court

explained that, in Ryan's case, the Department had used the full amount of Ryan's OASDI benefits received—$31,693.50—to reimburse itself for a portion of the cost of Ryan's care; in contrast, a child whose parents had died but who had a relative willing to act as representative payee also would have received foster care services but would have retained all of his OASDI benefits for future use. This would be so, the Juvenile Court posited, because the relative caregiver would be under no obligation to use the funds to reimburse the Department for the cost of the foster child's care.

The Juvenile Court further declared COMAR 07.02.11.29L and COMAR 07.02.11.29K(2) "ultra vires" and unsupported by any statutory authority. As we have explained, COMAR 07.02.11.29L directs the Department to apply a child's resources, including OASDI benefits, first to reimbursement for the child's cost of care; and COMAR 07.02.11.29K(2) provides that an OASDI-eligible foster child over age 18 receiving benefits directly may designate the Department as his or her representative payee or choose to receive his or her benefits directly and then reimburse the Department. The Juvenile Court reviewed the provisions of the Family Law Article and the Courts and Judicial Proceedings Article cited as statutory authority for the regulations. It concluded that these sections failed to authorize these regulations and that the regulations "conflict[ed] with the spirit of the statute." It also observed that in *Keffeler II,* the Supreme Court noted that the State of Washington is authorized by state law to seek reimbursement for the cost of foster care from the foster child's parents and from the foster child's own resources. No similar state law exists in Maryland.

The Juvenile Court also considered the Department's fiduciary duty to Ryan. Relying upon this Court's opinion in *Ecolono v. Division of Reimbursements of DHMH,* 137 Md. App. 639, 769 A.2d 296 (2001), it concluded that when the Department acts in its role as representative payee, it must exercise discretion in determining how to expend a foster child's OASDI benefits in keeping with the child's best interests. The Juvenile Court found that the *ultra vires* COMAR

regulations deprived the Department of any such discretion by requiring that the child's resources be applied first to reimburse the Department for the cost of care without any consideration of the child's individualized needs. The Juvenile Court held that by following that practice the Department had violated its fiduciary duty to Ryan.

Finally, the Juvenile Court considered an appropriate remedy. It emphasized that, had the Department given notice to Ryan when it applied to be and was appointed representative payee for Ryan's OASDI benefits, Ryan could have challenged the Department's designation as representative payee and/or its use of his OASDI benefits; and the Juvenile Court in the CINA case could have supervised the Department's expenditures to ensure that the funds were being applied in keeping with Ryan's best interests. The Juvenile Court decided that, because that did not occur, the remedy was "three fold." First, having reached the age of 18, Ryan could opt to receive his OASDI benefits directly;[12] and, if he did so, he would be "under no obligation to pay the funds to [the Department]." (Ryan would remain eligible to receive OASDI benefits beyond the age of 18, until age 19, because he still was in high school full time.) If for some reason the Department continued to act as Ryan's representative payee, however, the Department would be obligated to "come before the court with a plan for the use of the moneys [sic] received, and the court must rule on whether the proposed use [was] in [Ryan]'s best interests." Moreover, "[g]iven [Ryan]'s age, use of the funds to assist [him] in transitioning out of care [would] be given great weight."

Second, the Juvenile Court ruled that the Department was obligated to place a sum equal to the OASDI benefits for Ryan it already had received "in a constructive trust on behalf of [Ryan]." Third, the Juvenile Court held that the Department had to make a showing that its past actions in self-reimbursing

---

12. Again, the evidence before the Juvenile Court was that the Department had ceased receiving benefits on Ryan's behalf as of February 2011.

with Ryan's OASDI benefits were in Ryan's best interests and, if it did not, suggest an alternative use of the funds. As noted, a second hearing was scheduled for July 15, 2011, at which time evidence would be taken with regard to past and future uses of Ryan's OASDI benefits.

## D. The Second Hearing

On July 15, 2011, the parties reconvened for the second hearing. At the outset, counsel for the Department declared that the Department's accounting records revealed that it had erroneously applied at least $7,415.32 in OASDI benefits for Ryan to the cost of his care. Counsel explained that, pursuant to the governing "federal policy," the Department only is permitted to apply benefits received to cover current maintenance, which would include the beneficiary's prior month's cost of care. Thus, the $8,481 retroactive lump-sum benefit payment the Department received for Ryan in November of 2009 only could be used to pay for the cost of Ryan's care for October of 2009. Similarly, the $11,647.50 lump-sum benefit payment the Department received for Ryan in December of 2009 only could be used to pay for the cost of Ryan's care for November of 2009(in addition to the $771 current monthly payment received for that month). Department records also showed that it had expended just $111 for Ryan's care in May of 2010.[13] The Department's counsel stated that, assuming that figure to be accurate, the Department also should have conserved $660 of Ryan's $771 monthly benefit for that month. Thus, the total sum of the Department should have conserved was $8,075.32.

The Department called Exom to testify about the services Ryan had received while in foster care. The court accepted Exom as an expert in the field of social services. Exom testified that, in 2009, Ryan was diagnosed with an anxiety

---

13. The accounting of Ryan's benefits received and the Department's disbursements made on his behalf introduced into evidence at the May 17, 2011 hearing reflected a disbursement of $5,663.39 for that month, however.

disorder, "NOS"; [14] attention-deficit hyperactivity disorder ("ADHD"); and a learning disorder. As a result of these diagnoses, an individual education plan ("IEP") was prepared for Ryan and he was assigned to special education classes at his school. Ryan also had problems with substance abuse, mostly marijuana.

According to Exom, at first Ryan was placed in a foster home. He was removed, however, because the foster parent claimed that he stole a gun. Thereafter, Ryan was placed in Franklin, a regular (*i.e.*, non-therapeutic) group home. Staff from Franklin attended Ryan's IEP meetings at his school and monitored his school attendance. Franklin employed a full-time social worker as well. The Department paid Franklin between $5,000 and $6,000 per month for Ryan's care.

Ryan moved from Franklin into another foster home, under the care of a Mrs. C. Mrs. C was a friend of Ryan's aunt from church. [15] After approximately five months, Mrs. C. asked the Department to remove Ryan from her care. At Ryan's request, he returned to Franklin.

About one month after returning to Franklin, Ryan assaulted a staff member. He was removed from Franklin and placed at Dream Keepers, a therapeutic group home. After just two weeks, the Department declined to renew Dream Keepers's license. As a result, Ryan was moved to Star Flight, which, as discussed, also is a therapeutic group home.

At Star Flight, Ryan received a psychiatric assessment, therapy, and life skills training. While there, Ryan tested positive for marijuana. Thereafter, he was referred to Mountain Manor for substance abuse treatment. He was compliant with Mountain Manor's program until he turned 18. Exom

---

**14.** "NOS" is an abbreviation for "not otherwise specified," meaning that the disorder did not otherwise meet the criteria for any specific, recognized anxiety disorder. American Psychiatric Association, *Diagnostic And Statistical Manual Of Mental Disorders*, 444 (4th ed.1994).

**15.** Ryan's aunt is referenced at various times in the transcript. It is unclear whether she is a maternal or paternal aunt. Apparently, she never was a custodial resource.

acknowledged that these services were paid for by the Maryland medical assistance program, not Department funds. Star Flight staff provided 24–hour supervision and room and board.

Exom testified that Ryan was repeatedly truant from school. While workers at the various group homes could ensure that he arrived at school on time in the morning, they could not ensure that he stayed there. Ryan rarely brought homework home with him. The staff at the group homes assisted foster children with their homework if they brought it home.

Exom was asked on cross-examination whether Department staff ever sought out additional educational resources for Ryan, such as one-on-one tutoring. He replied that they did not. He also was asked whether the Department had offered Ryan individualized assistance in pursuing his stated career goal of becoming a park ranger. Exom testified that he had tried to arrange for Ryan to meet with one of Exom's friends who is a park ranger, but that he had been unable to find a suitable date.

In response to questioning by the Juvenile Court judge, Exom explained that he personally had not had any knowledge that the Department was receiving OASDI benefits on behalf of Ryan; therefore, the receipt of those benefits had not had any impact on Ryan's placements or on the resources made available to him.

The Department next called Emily Tarbutton, the Unit Manager in its Permanency Division. Tarbutton holds a Master's Degree in social work and is a Licensed Clinical Social Worker. At the relevant times she was in charge of between five and six supervisors in the division, each of whom in turn supervised six caseworkers. The Juvenile Court accepted Tarbutton as an expert in the fields of social work and foster care.

Tarbutton testified that Exom was transferred to her unit in April of 2010. Since then, she had met Ryan one time, in April of 2011, at a family involvement meeting ("FIM"). The FIM was held to discuss the possibility of Ryan's entering Mr.

B.'s care. The Department ultimately determined that Mr. B. met its criteria for a "fictive kin," [16] so Ryan could be placed in his home even though Mr. B. was not a licensed foster parent. Tarbutton also testified generally concerning the DHR's contracts with group homes and licensed foster care providers. She explained that each contract requires the homes or individual providers to supply services to a foster child in six "domains": 1) education, 2) employment, 3) health and mental health, 4) housing, 5) financial literacy and resources, and 6) family and friend support. Franklin, Dream Keepers, Star Flight, and Mrs. C. all were required to provide or support these services for Ryan and Tarbutton testified that each in fact had done so. She further testified that the Department paid Franklin $6,221.40 for care for Ryan for the month of November 2009.

The Juvenile Court judge asked Tarbutton whether the Department was enforcing a COMAR regulation that allowed it to take a foster child's earnings through employment and apply the earnings to the cost of the child's care. She replied that the Department was not doing so. She analogized the use of OASDI benefits to contribute to the cost of care to the use of child support collected from a foster child's parents to contribute to the cost of care. Steven Youngblood was called as the Department's last witness. Youngblood ran the Department's "Ready by 21" program, which is a "supportive arm" of the Permanency Division. It is designed to assist in preparing foster children for independent living when they reach age 21 and no longer are eligible for any foster care services. He explained that finding "meaningful connections" for foster children is key.

Youngblood became involved in Ryan's case after Mr. B. contacted him directly to inquire about services that could help Ryan prepare for independent living. Thereafter,

---

16. Tarbutton explained that the term "fictive kin," refers to a non-relative with whom a foster child has developed a familial relationship. A placement with a fictive kin is treated like a relative placement.

Youngblood arranged the FIM, which resulted in Ryan's entering Mr. B.'s care.

On cross-examination, Youngblood testified that Ready by 21 encourages foster youth to save their earned and unearned income, including OASDI benefits, when they are living in certain independent or semi-independent living situations. *See* 20 C.F.R 404.2010(b). He also testified that Ryan is eligible to attend an in-state college free of charge or to receive a partial tuition stipend for an out-of-state college.

Ryan testified on his own behalf. With respect to his placements in the various group homes, he reported that they provided food and shelter and nothing else. He said he was supposed to be paid a weekly allowance of between $15–20 at Franklin for performing chores, but rarely, if ever, received it. In the ten months that he resided at Franklin, he was taken shopping for clothing and personal items on two occasions. Each time he was given $150 to spend on clothing. He described the staff at Franklin as "thugs off the street." [17]

Ryan characterized the staff at Star Flight as "supportive" but said the home was poorly managed. He was not provided clothes while he was there and was unable to do his laundry for weeks because the washing machine or dryer was broken. At that time, Ryan was spending his Sundays with Mr. B. and his family. Even though Ryan had an arranged, scheduled drop-off time at Star Flight on Sunday evenings, he routinely returned there to find nobody home. Mr. B. bought him toiletries while he was placed at Star Flight.

With respect to education, Ryan explained that he did not attend school "to learn"; rather, he "went to school and had fun." He rarely brought homework home with him when it was assigned.

---

17. On cross-examination, Ryan was asked why he had asked to be returned to Franklin after his brief placement with Mrs. C. He responded that he made the request because Franklin was familiar to him, so returning there was better than being placed in a new, unfamiliar environment.

At the conclusion of all the evidence and after hearing argument of counsel, the Juvenile Court ruled from the bench. It framed the issue before it as follows:

So the question today, and the only question today was could we establish that the past monies paid by Social Security which were taken by [the Department] and applied to reimburse itself represented the best interests of [Ryan], and then going forward what is the best plan for the use of the money, however it would be?

Referencing the Department's admission that between "$7,400 and some dollars or [$]8,019" of Ryan's benefits had been improperly applied to reimburse it for some of the costs of Ryan's care, the judge opined that the "concession" illustrated the problem with the Department's "automatic practice" of self-reimbursement. Specifically, the judge observed that "it's not supervised by a court, it does not go through the normal review processes which are fairly elaborate here in Juvenile Court by which all other matters of the child's care and conduct are reviewed." The judge noted that the mistake in the use of some of Ryan's OASDI benefits only was discovered because Ryan had challenged the Department's right to use his funds at all. The judge analogized the Department's role as Ryan's representative payee to a trustee-beneficiary relationship, opining that "trusts are subject to supervision by courts ... to protect the respondents or the beneficiaries of a trust from error and possible wrong doing and to make sure that in fact the money is being used for proper purposes."

Turning once again to COMAR 07.02.11.29, the Juvenile Court judge emphasized that, by the plain language of the regulation, a foster child would never be permitted to use any of his or her resources—be they OASDI benefits, an inheritance, or monies earned through employment—for any purpose except for reimbursement of the cost of care, unless his or her resources exceeded that amount. The judge noted, however, that Department witnesses had testified that the Department did not enforce the regulation that required fos-

ter children over the age of 18 to pay over to the Department any OASDI benefits received.

The Juvenile Court judge opined as follows about the Department's past use of Ryan's OASDI benefits:

[The Department] described some fairly intensive and wide-ranging service[s] which [ ] were provided for Ryan, and the services included a variety of placements and therapy sessions and other kinds of services, and I think made the argument that the number one, all those services were appropriately given, and number two, that they were costly and that the Department in fact expended substantial amounts of money for these purposes.

Now the testimony also was pretty clear that regardless of whether or not Ryan [ ] had money from the outside, his own resources, Social Security payments or anything else those services would have been provided and they would have been provided in the same manner.

I think that is in fact a good mark for [the Department] in the sense that its people are not paying attention to that kind of financial issue but rather are focused on the child.

Now, [Ryan] has commented that he received poor services in the various placements he was at, that is actually not the issue in the case, it is something worth exploring perhaps on the part of [the Department] as to whether [its] contractors are in fact providing what's being paid for, but that's an issue for a different day.

Right this minute just for the sake of argument we are assuming that the services were provided as contracted for and were paid in for in the normal course of business and the like, but there was no statement here indicating that the money that he was receiving was used for anything other than reimbursement, they did not buy services over and above what would have been [the Department]'s obligation under any circumstances to provide, as a result I cannot find that the past use of these monies represented the use in the best interest of the child. It seems to me that these monies were in the best interest, an understandable interest, but nevertheless best interest of the agency itself.

I can understand exactly why especially in times of fiscal tightness why that might be something that the agency would want to do, but nevertheless I don't believe it's justified in this case.

Based on this conclusion, the Juvenile Court judge determined that a sum equal to the entire amount of OASDI benefits the Department had received on behalf of Ryan ($31,693.50) should be placed in a constructive trust. The judge credited Youngblood's testimony that it would be in Ryan's best interest to have the use of these funds as he transitions out of foster care in a few years.

As a matter of logistics, counsel for the Department explained that it maintains trust accounts for some foster children who receive benefits that exceed the cost of their care, and that it could maintain such a Foster Care Trust Account for Ryan. Counsel for Ryan asked that Mr. B., not the Department, be appointed as the trustee. The judge ruled that the Department would act as trustee for the following six months, and would be obligated to notify the court and Ryan any time it sought to make an expenditure from the account. The judge denied the Department's request for the ruling to be stayed pending appellate review.

That same day, the Juvenile Court entered an order directing that the "[m]onies [should] remain in [a] trust account for 6 months with [the Department]," with a review hearing in six months. The order further specified that Ryan's "education [was] to be made a priority" and that the Department was to give notice to the Juvenile Court and to Ryan before making any expenditures from the Foster Care Trust Account.

On August 12, 2011, the Department noted this appeal.

## DISCUSSION

### I.

### Motion to Dismiss

Ryan has moved to dismiss this appeal or, in the alternative, to strike several sections of the Department's brief as untime-

ly. He argues that the Juvenile Court's June 16, 2011 Order declaring that the Department had violated the federal and Maryland constitutions by using OASDI benefits it had received as his representative payee to reimburse itself and further declaring that two COMAR regulations invalid was a final, appealable order, and that the Department failed to note an appeal from the Order within 30 days of its entry, as the rules require. *See* Md. Rule 8–202. Ryan maintains that only the court's July 15, 2011 Order directing the Department to hold a sum equal to all of Ryan's OASDI benefits in a trust account subject to Juvenile Court supervision properly was appealed, as the notice of appeal of that order was filed on August 11, 2011, within 30 days of the order's entry.

The Department opposes the motion to dismiss, arguing that the July 15, 2011 Order "finally resolved the claims in Ryan's motion [to control conduct]" and, accordingly, the August 11, 2011 notice of appeal was timely filed and covered all of the decisions and rulings made by the Juvenile Court on Ryan's "motion to control conduct," including those addressed in the June 16, 2011 Order and those addressed in the July 15, 2011 Order. We agree with the Department.

█ CJP section 12–301 provides that, with limited exceptions not relevant here, a party may appeal only from a final judgment.

> To qualify as a final judgment, an order "must either decide and conclude the rights of the parties involved or deny a party the means to prosecute or defend rights and interests in the subject matter of the proceeding," *Nnoli* [*v. Nnoli* ], 389 Md. [315], 324, 884 A.2d [1215] at 1219–20 [ (2005) ], and must, ordinarily, satisfy three criteria:
>
> > (1) [I]t must be intended by the court as an unqualified, final disposition of the matter in controversy, (2) unless the court properly acts pursuant to Md. Rule 2–602(b), it must adjudicate or complete the adjudication of all claims against all parties, and (3) the clerk must make a proper record of it in accordance with Md. Rule 2–601.

*Rohrbeck v. Rohrbeck,* 318 Md. 28, 41, 566 A.2d 767, 773 (1989).

*Miller & Smith at Quercus, LLC v. Casey PMN, LLC,* 412 Md. 230, 242–43, 987 A.2d 1 (2010). In deciding whether an order meets these criteria, we consider whether it "was unqualified, whether there was any contemplation that a further order [was to] be issued or that anything more [was to] be done." *Rohrbeck,* 318 Md. at 41–42, 566 A.2d 767 (citations omitted).

■ Here, the Juvenile Court's June 16, 2011 Order contained "findings" that the Department's practice of self-reimbursement violated Ryan's due process and equal protection rights; that COMAR 07.02.11.29K(2) & L were void; that enforcement of those same regulations resulted in a breach of the Department's fiduciary duty to Ryan; and that the Department's actions "have not been shown to be in the best interests of [Ryan]." By that order, however, the parties were directed to appear for a second hearing on July 15, 2011, to address, *inter alia,* whether the Department's "past actions in reimbursing itself were in the best interests of [Ryan]" and what remedy to impose for the violations the Juvenile Court had found. Thus, it is plain that the June 16, 2011 Order "contemplat[ed] that a further order" would issue and that there was something more to be done.

Moreover, the June 16, 2011 Order left open the possibility that the Juvenile Court would find that the Department's actions in applying Ryan's OASDI benefits toward the cost of his care were in his best interests. In reliance upon the June 16, 2011 Order, both the Department and Ryan presented testimony and other evidence at the July 15, 2011 hearing bearing on that issue. At the conclusion of the July 15, 2011 hearing, the Juvenile Court ruled that the Department's self-reimbursement was not in Ryan's best interests and that the appropriate remedy for the Department's violations was for it to deposit the entire amount of OASDI benefits it had received on behalf of Ryan into a court-supervised trust account. The Juvenile Court issued and docketed its final order that

day (July 15, 2011). The Department's notice of appeal was filed within 30 days of the entry of that final judgment. Accordingly, the Department's notice of appeal was timely filed, and Ryan's motion to dismiss or in the alternative to strike must be denied.

## II.

### The Department's Use of Ryan's OASDI Benefits

#### A. The *Keffeler* Trilogy

In 2001, the Supreme Court of Washington decided *Guardianship Estate of Danny Keffeler v. Department of Social and Health Services*, 145 Wash.2d 1, 32 P.3d 267 (2001) ("*Keffeler I*"). In that case, a group of foster children sued the Washington State Department of Social and Health Services ("DSHS") alleging that its practice of serving as representative payee for foster child social security benefits—both OASDI benefits and supplemental security income ("SSI") [18]—and of applying those benefits to reimburse itself for the cost of the children's care violated the anti-attachment provision of 42 U.S.C. section 407(a); deprived foster children of their property without due process of law; and abridged the rights of the foster children to equal protection of the laws. The trial court certified a class comprised of all foster children in the State of Washington, "past, present, and future . . . that receive [social security benefits] for whom the State of Washington acts or has sought to act as 'representative payee.'" [19] *Id.* at 273. On

---

**18.** Eligibility for SSI is determined based upon income, with the benefit amount being calculated upon need. In contrast, OASDI is an insurance program, with eligibility and the benefit amount dependent on the number of work credits earned by the insured worker.

**19.** The class representative, Danny Keffeler, was a foster child who was living with his grandmother and receiving social security benefits. His grandmother, as his legal guardian, acted as his representative payee. As the court described it, an "overzealous [DSHS] employee sought to have Danny's grandmother and guardian removed as representative payee," *id.* at 273, and have the DSHS appointed in her place. After four years of litigation against the DSHS involving Danny's case, his grandmother brought suit on his behalf and asked that it be certified as

cross-motions for summary judgment, the trial court ruled that the DSHS's practice of self-reimbursement violated the anti-attachment clause of the Social Security Act, as found in 42 U.S.C. section 407, and also violated the foster children's due process rights under the Fourteenth Amendment of the United States Constitution.

Under Washington statutory law, the Secretary of the DSHS may act as custodian of any monies or funds coming into the possession of any person committed to the agency's care. Wash. Rev.Code § 74.13.060 (2011). The DSHS may use those funds to cover the costs of the beneficiary's "personal needs ... as the secretary may deem proper and necessary" and also may "apply such funds against the amount of public assistance otherwise payable to [the beneficiary]," including through self-reimbursement for costs expended on the beneficiary's behalf. *Id.* Under this legislative authority, the DSHS promulgated a regulation providing that whenever a foster child is entitled to "financial benefits," including those under OASDI, the benefits "shall be used on behalf of the child to help pay for the cost of the foster care received...." Wash. Admin. Code § 388–70–069 (1983). (Although this regulation subsequently was repealed, WAC 388–25–0210, another regulation, which took effect on April 30, 2001, similarly provides that a foster child's "unearned income," including social security benefits, will be applied to cover the cost of the child's care.)

The DSHS was acting as representative payee for 1,411 children in foster care who were receiving social security benefits. Two units of DSHS played a role. The Children's Administration Unit provided services to all children in foster care; applied for social security benefits for children in its custody; and appealed adverse social security benefit determinations. The social security benefits that were received were deposited in a foster care trust fund account at the state

a class action consisting of Danny and all similarly situated foster children. Thereafter, DSHS abandoned its efforts to replace Danny's grandmother as representative payee.

treasurer's office. There the Trust Fund Unit maintained a "subsidiary account" for each child. 32 P.3d at 272. Each month that a child was in DSHS's care, the Children's Administration Unit issued a report for the child showing the amount of money paid on his or her behalf for the prior month. Using this report, the Trust Fund Unit then would direct the state treasurer to disburse the child's social security benefits to the Children's Administration Unit to reimburse DSHS up to the full amount of those costs. DSHS had discretion to spend a foster child's benefits "on items other than current basic foster care expenses." *Id.* For example, social workers in the Children's Administration Unit could "request that a child's benefits be used for extra items or special needs, such as computers, educational expenses, summer camps, counseling, toys, clothing, athletic equipment and orthodontics." *Id.* The Trust Fund Unit and the Children's Administration Unit worked together to determine whether any given expense was authorized.

Lastly, DSHS was authorized to "conserve and invest" social security benefits received on behalf of foster children. *Id.* Benefit money received but not spent on the foster child's basic needs or on special expenses would be deposited into an interest-bearing account for the child. The benefit money would be disbursed to a successor representative payee or would be paid directly to the child upon emancipation.

In considering the propriety of DSHS's practices, the Washington Supreme Court focused primarily on the anti-attachment provision in the Social Security Act, at 42 U.S.C. section 407(a). That statute, entitled "Assignment of benefits," provides:

> The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

The court opined that the above provision was intended to "remove Social Security benefits from the reach of creditor's employing legal process." 32 P.3d at 273. It concluded that DSHS's practice of "confiscat[ing]" foster children's social security benefits for the state violated that provision. *Id.* at 274. The court noted that the evidence from DSHS was that it would not apply to be the representative payee for a foster child unless it could self-reimburse. It also emphasized that DSHS lacked authority to "seek reimbursement from benefits paid to *private* representative payees" on behalf of a child. *Id.* (Emphasis in original.) Thus, the court reasoned, DSHS received social security benefits on behalf of foster children only if it was acting as a representative payee for the child and only for the purpose of "confiscat[ing] the child's money." *Id.* at 275 (footnote omitted). The court concluded that a foster child necessarily would be "better off with any payee other than the state because DSHS must provide foster care under state law *regardless* of whether it receives a reimbursement." *Id.* (Emphasis in original; footnote omitted.)

The court read federal cases interpreting the anti-attachment provision to "evince an expansive interpretation of the protections of § 407" and support the proposition that social security benefits are "beyond the reach of the state, however clever or subtle its attempt to seize them." *Id* at 276. It held that, although the DSHS was acting permissibly, and as expressly contemplated under federal regulations by applying to act as representative payee for foster children, its practice of self-reimbursements was a means of reaching the benefits by "other legal process," in violation of the anti-attachment provision of the Social Security Act. Moreover, "the reimbursement scheme," manifested a creditor-debtor relationship because, by its nature, foster children's benefits were being used to repay DSHS for services rendered. *Id.* at 275. Having concluded that DSHS's practices violated the anti-attachment provision, the court declined to reach any of the constitutional issues.

The United States Supreme Court granted *certiorari* and, in *Keffeler II,* reversed. Justice Souter, writing for a unani-

mous Court, held that DSHS's practice of "receiv[ing] and manag[ing] Social Security benefits" for foster children and using those benefits to "reimburse itself for some of its initial expenditures" did not violate the anti-attachment provision of the Social Security Act. 537 U.S. at 375, 123 S.Ct. 1017. This was so because under the Social Security Act and the regulations implementing it, the DSHS properly could be appointed representative payee for a foster child and, acting in that role, properly could apply a child's benefits to pay for the child's "current maintenance."

Pointing out that foster children have no legal obligation to repay the state for the cost of their care, the Supreme Court rejected the Washington Supreme Court's reasoning that the DSHS occupied a creditor-type relationship *vis-a-vis* a foster child. Moreover, the Court emphasized that case law interpreting the anti-attachment provision did not mention "creditors" but instead barred the use of legal process to reach social security benefits. *See Philpott v. Essex County Welfare Bd.*, 409 U.S. 413, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973) (interpreting the anti-attachment provision of the Act to bar New Jersey from enforcing agreements with welfare recipients requiring them to assign to the state their retroactive lump-sum social security benefit payments as a means of reimbursing the state for welfare benefits received). Construing the phrase "other legal process," the Court explained that it

should be understood to be process much like the processes of execution, levy, attachment, and garnishment, and at a minimum, would seem to require utilization of some judicial or quasi-judicial mechanism, though not necessarily an elaborate one, by which control over property passes from one person to another in order to discharge or secure discharge of an allegedly existing or anticipated liability.

537 U.S. at 385, 123 S.Ct. 1017. The DSHS's actions as representative payee clearly fell outside of this definition as it was in rightful possession of the foster children's benefits as their representative payee and had used the benefits as permitted under the federal regulations to self-reimburse for the

cost of the children's current maintenance. The Court went on to say:

The regulations previously quoted specify that payments made for a beneficiary's "current maintenance" are deemed to be "for the use and benefit of the beneficiary," and define "current maintenance" to include "cost[s] incurred in obtaining food, shelter, clothing, medical care, and personal comfort items." 20 CFR §§ 404.2040(a), 416.640(a). There is no question that the state funds to be reimbursed were spent for items of "current maintenance," and although the State typically makes the accounting reimbursement two months after spending its own funds, this practice is consistent with the regulation's definition of "current maintenance" as "costs incurred" for food and the like. That the State is dealing with the funds consistently with Social Security regulations is confirmed by the Commissioner's own interpretation of those regulations as allowing reimbursement by a representative payee for maintenance costs, at least for costs incurred after the first benefit payment is made to the payee. *Cf.* POMS GN 00602.030 (defining a "past debt," which may be satisfied only if a beneficiary's current and reasonably foreseeable needs are met, as "a debt the beneficiary incurred before the date of the first benefit payment is made to the current payee").

*Id.* at 386–87, 123 S.Ct. 1017 (footnote omitted).

Having concluded that DSHS's practice of self-reimbursement did not amount to "other legal process," Justice Souter turned to "the real basis of [the foster children's] objections to the reimbursement practice," which he concluded was their position that the practice was "antithetical to the best interest of the beneficiary foster child." *Id.* at 389, 123 S.Ct. 1017. The Court disagreed, opining:

Although it is true that the State could not directly compel the beneficiary or any other representative payee to pay Social Security benefits over to the State, that fact does not render the appointment of a self-reimbursing representative payee at odds with the Commissioner's mandate to find that a beneficiary's "interest … would be served" by the ap-

pointment. 42 U.S.C. §§ 405(j)(1)(A), 1383(a)(2)(A)(ii)(I). Respondents' premise that promoting the "best interests" of a beneficiary requires maximizing resources from left-over benefit income ignores the settled principle of administrative law that an open-ended and potentially vague term is highly susceptible to administrative interpretation subject to judicial deference. *See Chevron [U.S.A., Inc. v. Natural Resources Defense Council, Inc.]*, 467 U.S. [837] at 842–843 [104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ]. Under her statutory authority, the Commissioner has read the "interest" of the beneficiary in light of the basic objectives of the Act: to provide a "minimum level of income" to children who would not "have sufficient income and resources to maintain a standard of living at the established Federal minimum income level," 20 CFR § 416.110(SSI); *see also Sullivan v. Zebley,* 493 U.S. 521, 524 [110 S.Ct. 885, 107 L.Ed.2d 967] (1990), and to provide workers and their families the "income required for ordinary and necessary living expenses," § 404.508(a) (OASDI); *see also Califano v. Jobst,* 434 U.S. 47, 50 [98 S.Ct. 95, 54 L.Ed.2d 228] (1977). **The Commissioner, that is, has decided that a representative payee serves the beneficiary's interest by seeing that basic needs are met, not by maximizing a trust fund attributable to fortuitously overlapping state and federal grants.** *Id.* at 389–390, 123 S.Ct. 1017 (emphasis added) (footnote omitted).

The Supreme Court declined to reach the arguments raised by the class that DSHS violated § 405(j) of the Act by, *inter alia,* "failing to exercise discretion in how it uses benefits," noting that the class was free to "press their stand-alone § 405(j) arguments before the Commissioner, who bears responsibility for overseeing representative payees, or elsewhere as appropriate." *Id.* at 389–90 n. 12, 123 S.Ct. 1017. It emphasized, however, that local departments of social services are the representative payees of last resort because the Commissioner appoints them "only when no one else will do." *Id.* at 391, 123 S.Ct. 1017. If these state agencies are to be discouraged from accepting appointment as representative payees for foster children, it is likely that the foster children

"would either obtain no Social Security benefits or need some very good luck to get them." *Id.*

On remand from the Supreme Court's decision, the Washington Supreme Court considered the constitutional challenges raised by the plaintiff class. *Keffeler III,* 151 Wash.2d 331, 88 P.3d 949 (2004). The plaintiff class argued that the DSHS practice created two classes of foster children "based on who is appointed as the representative payee." *Id.* at 953. Foster children for whom DSHS was acting as representative payees comprised the first class. Under state law, those children's benefits would be applied to cover the cost of their care and only any excess above and beyond that amount would be conserved for future use. The second class was comprised of foster children for whom a relative or other non-agency people were acting as representative payee. As DSHS had conceded that it could not require a private representative payee to pay for the foster child's cost of care, such a child with a private representative payee would be able to let the State pay for the cost of his care and conserve his OASDI benefits for future use. Thus, the plaintiff class argued, the two classes of children were treated unequally.

The *Keffeler III* court rejected this argument. It opined: Keffeler's arguments fail because there are not two groups of foster children but one group: all foster children receiving social security benefits with appointed representative payees. The identity of the representative payee does not create a differentiation in this group because *all representative payees* must use the benefits according to state and federal laws and regulations. This means that the benefits first should be used for the child's cost of care and reasonably foreseeable needs. Then, only after the cost of care and foreseeable needs are provided, may the benefits be conserved or invested. 20 C.F.R. §§ 404.2045(a), 416.645(a) (2003). In accordance with 42 U.S.C. § 407, the State may not go after a private representative payee to obtain the benefits. However, if the private representative payee is not using the benefits for the child's cost of care and reasonably foreseeable needs, this may violate federal regu-

lations and the Commissioner may remove the representative payee. 20 C.F.R. §§ 404.2050, 416.650 (2003).

*Id.* at 953–54 (emphasis in original) (footnotes omitted). The court further emphasized that, pursuant to Washington state law, the secretary of DSHS maintained discretion over how to use the benefits and could authorize disbursements for special needs or "conserv[e] funds prior to a child's emancipation." *Id.* at 954. Because both state and private representative payees were bound by the same laws and regulations and because both were accorded and did exercise discretion in applying benefits according to those laws and regulations, the court concluded that only one class "of foster children" existed and, on that basis, rejected the equal protection challenge.[20]

The court next addressed the due process challenge, rejecting it as well. It explained that the Commissioner, not DSHS, notified beneficiaries whenever a representative payee was appointed. The notice would be sent to "the legal guardian or legal representative of beneficiaries under 15, or unemancipated minors under 18" in advance of the first benefit payment. *Id.* at 955. The plaintiff class argued that this was insufficient and that DSHS should have sent "notice to the juvenile court and assign[ ] an attorney to each child to either find another representative payee or start a judicial guardianship." *Id.* at 956. Finding no merit in this argument, the court concluded that the federal notice was sufficient to protect the foster children's due process rights and that any interest in additional notice was outweighed by the State's interest in the efficient administration of the foster care program.

## B. Maryland Cases

*Conaway v. Social Services Administration,* 298 Md. 639, 471 A.2d 1058 (1984), is important to our analysis. In that

---

**20.** The plaintiff class also alleged that DSHS was misusing the benefits of a sub-class of foster children by double-dipping, sweeping children's accounts to pay for past expenses, and using benefits for programmatic costs. The Washington Supreme Court concluded that these arguments would more appropriately be directed to the Commissioner.

case, the Court of Appeals framed the issue as "whether the Baltimore City Department of Social Services may use federal benefits conserved for a foster child as reimbursement for the cost of past care." *Id.* at 640, 471 A.2d 1058. The Court answered the question in the negative.

The relevant facts were as follows. In 1967, when he was six years old, Crystal Conaway was committed to the custody of the local department. He remained in a foster home until he turned 18. During this 12–year period, his foster parent received regular foster care payments from the local department. Also during that time, Conaway's father, a veteran, became totally disabled. As a result, in 1967, Conaway became eligible to receive veteran's benefits and, in 1970, he also became eligible to receive social security disability insurance benefits. While the amounts varied, his monthly benefits generally ranged between $73 and $83. He stopped receiving them in 1979, when he turned 18.

For the entire time that Conaway received benefits, the Department acted as his representative payee. Pursuant to then-existing COMAR 07.02.11.07(B)(4)(1980),[21] the Department was permitted to conserve a foster child's federal benefits beginning when the child turned 12 for the child's "future educational or vocational needs." *Id.* at 641, 471 A.2d 1058. Thus, for the first six years that the Department was acting as

---

**21.** That regulation, entitled "Conservation of Child's Income for Future Identifiable Needs," provided in relevant part:

   (a) The child's earnings or other income may be conserved for his current or future educational needs when he is 12 years old or older and there is indication that he will graduate from high school or be enrolled in a training program related to self-support. . . . .

   (b) The child's earned income may be conserved for his other future identifiable needs related to employment, cultural and educational pursuits, recreation, and the establishment of a home.

   (c) Receipts conserved for future needs of the child are to be deposited to an interest bearing trust account on a monthly basis. If at any time conserved funds are not used or are not to be used for the agreed upon educational or other identifiable needs, they become a resource to be taken as a refund for the cost of foster care. . . .

representative payee for Conaway, it applied his benefits toward the cost of his care, as permitted by federal regulation; and then beginning in 1975,[22] the Department began conserving Conaway's federal benefits in a trust account established in his name. "Disbursements from this account were made to Conaway for various educational programs including driving school, modeling school, and music schools." *Id.*

In September of 1981, the DHR promulgated the amended version of 07.02.11.07, now present 07.02.11.29, which, as discussed, requires the Department to apply a foster child's benefits toward the cost of the child's care. Only monies in excess of that cost can be conserved for future use. Funds conserved under the prior policy would be retained "as long as the child continued in foster care and held to the original plan." *Id.* at 641, 471 A.2d 1058. Under the prior policy, if the foster child reached the age of 18 and remained in school, the conserved funds would be applied toward his educational needs. If the child no longer was in school, however, any remaining conserved funds would be applied retroactively to the cost of the child's care. In keeping with this policy, the State issued a circular directing the local department heads to "recoup immediately all conserved funds of foster children age eighteen and over not attending school on September 1, 1981." *Id.*

Prior to his 18th birthday, Conaway was warned of the consequence of not staying in school. Nevertheless, he did not remain in school and, in November of 1981, received a notice of intended action from the Department. The notice stated that because he no longer was enrolled in school of any kind his "conserved funds w[ould] be reverted back to th[e] agency to pay for the cost of [his] foster care." *Id.* at 642, 471 A.2d 1058. The notice explained that the "conserved funds" referred to "money that had been conserved for [his] edu-

22. While Conaway turned 12 in 1973, for reasons not explained the Department did not begin conserving his funds until he turned 14.

cation, from [his] benefits from the Veterans' Administration and the Social Security Administration." *Id.*

Conaway filed an administrative appeal of this decision. DHR held a hearing and approved the Department's decision. Conaway petitioned for judicial review in the circuit court, which affirmed. Before his appeal could be heard in this Court, the Court of Appeals granted *certiorari.*

Conaway argued before the Court of Appeals that, because "he was not financially liable for the cost of his foster care," he could not be "compelled to reimburse the State for payments properly made on his behalf." *Id.* at 643, 471 A.2d 1058. The Court concluded that a child who has reached the age of majority cannot be compelled, after reaching that age, to reimburse the Department with "subsequently acquired assets." *Id.* The assets in Conaway's case had been acquired previously, however, during his time in foster care. The Court emphasized that under federal regulations the benefits "could have been used to pay for the cost of [his] care." *Id.* at 644, 471 A.2d 1058. However, under the anti-attachment provision of the Act, once the Department acted to conserve benefits for a foster child's future needs, it could not later seize those funds to reimburse itself for the cost of the foster child's past care. Because that is what had happened with Conaway, the Court of Appeals agreed that he was not obligated to pay for the cost of his care.

In *Ecolono, supra,* 137 Md.App. at 639, 769 A.2d 296, also an administrative appeal, this Court considered whether the Department of Health and Mental Hygiene ("DHMH") violated state or federal law when, as representative payee for a patient committed to a state hospital, it used the patient's social security benefits to reimburse itself for the cost of the patient's care. The patient, Ecolono, was committed to the Clifton T. Perkins Hospital Center for one year and three months. During his commitment, a financial agent supervisor for the DHMH Division of Reimbursements applied to SSA to have the Secretary of DHMH be appointed representative payee for Ecolono for purposes of receiving social security

disability benefits on his behalf.[23]  The application was approved and, in February of 1996, less than two months before Ecolono's release, the DHMH received a lump sum backpayment of $17,155.40.  The Division of Reimbursement calculated the eligible amount expended or to be expended for Ecolono's care for the months of February and March of 1996 and applied the benefits to the cost of care.  Ecolono received $2,580 in excess above that amount.[24]

On March 26, 1996, Ecolono was released on the condition that, within 90 days thereafter, he move out of his parents' house and attend AA and NA meetings daily for 90 days, and weekly thereafter.  The 90–day provision was based in part on his treatment team's understanding that he would be the recipient of social security benefits in the near future and 90 days would be sufficient time for him to access those funds and attempt to become self-supporting.

Subsequently, Ecolono challenged the application of his benefits to the cost of his care.  At a hearing before an Administrative Law Judge ("ALJ") at the Office of Administrative Hearings ("OAH"), he argued that federal law required a representative payee to use benefits in the beneficiary's best interests, and that that had not been done in this instance.  He also argued that the DHMH had violated federal law by seizing his benefits under the federal anti-attachment statute and had violated state law by failing to assess his expenses before assessing charges against him.

During the OAH hearing, a member of Ecolono's treatment team testified that, after his release, Ecolono would incur living expenses and costs involved in restarting a prior business.  She further testified that, as part of Ecolono's discharge plan, a portion of the social security benefits were to be set aside to cover those costs.  She opined that a lack of funds

---

**23.**  Ecolono was eligible for disability benefits by reason of his addiction to drugs and/or alcohol.  Since that time, federal law has been amended to exclude this as an eligible disability.

**24.**  He later was refunded an additional $1,347 because he was released prior to the end of March.

upon release compromised Ecolono's discharge plan. Testimony at the hearing also established that when the officer in the Division of Reimbursement applied the social security benefits to cover the cost of Ecolono's care, he did so without any communication with Ecolono's treatment team and without knowing that Ecolono was about to be released. Similarly, the treatment team was unaware that the benefits had been paid out.

The ALJ concluded that, under state law, Ecolono was primarily responsible for the cost of his care and that DHMH did not violate state or federal law by using his benefits to reimburse itself for those costs. The circuit court affirmed that decision on judicial review.

On appeal to this Court, Ecolono argued that DHMH had a fiduciary duty to use social security benefits received on behalf of patients in their best interests and that it had breached that duty to him by failing to consider his discharge needs. He also argued that the use of the benefits violated the anti-attachment provision of the Act and that it violated state law because the Division of Reimbursement had not investigated his financial condition and expenses before assessing charges against him.

We first addressed the issue of subject matter jurisdiction. We concluded that a state court has subject matter jurisdiction to consider a challenge to the use of social security benefits, notwithstanding the SSA's role in supervising representative payees generally and the existence of federal mechanisms to challenge the appointment of a representative payee and/or the representative payee's use of a beneficiary's benefits.

Turning to the argument that the DHMH had a fiduciary duty to use Ecolono's benefits in his best interests, and had breached that duty, we concluded, after a discussion of applicable federal and state regulations, that "the application of social security benefits to current maintenance is regarded by the SSA as being in the best interest of the beneficiary" and that the services rendered by the hospital qualified as current

maintenance expenses. *Id.* at 655, 769 A.2d 296. Upon exhaustive review of cases bearing on the application of social security benefits to the cost of care for a beneficiary in a state institution, we opined:

[A] representative payee does have a duty to expend Social Security benefits in the best interest of the beneficiary and does have discretion in fulfilling that duty. Contrary to appellant's assertion, we see nothing in the ALJ's opinion, adopted by appellee, that indicates a conclusion to the contrary. Rather, on the strength of 20 C.F.R. §§ 404.2035 and 404.2040, the ALJ concluded that the representative payee fulfilled its duty by applying the benefits to appellant's charges for current maintenance, a federally approved expenditure. As stated earlier, such payment is expressly permitted but not mandated by Federal law. The cases discussed herein are helpful, but for the most part, are not on point in that they do not involve the application of social security benefits to the costs of current maintenance by a State acting as representative payee when the issue is whether the funds should be conserved for future use. We find nothing in the Social Security Act or its regulations expressly establishing a preferred order of otherwise acceptable expenditures.

In the end, however, we are left with the conclusion that, under federal law, a representative payee has a duty to exercise discretion and, in fact, the Secretary [of DHMH] did not exercise discretion. As a result, we shall reverse and remand so that the Secretary can exercise discretion and determine whether any or all of the funds applied to the cost of current maintenance should be refunded to appellant or applied to other charges.

*Id.* at 667, 769 A.2d 296 (footnote omitted). In a footnote, we emphasized that had the Secretary of DHMH exercised discretion and determined that Ecolono's benefits should be used to cover the cost of his care, we would not have found an abuse of discretion under the circumstances. Also, in reliance on *Conaway,* we rejected Ecolono's contention that the use of his benefits implicated the anti-attachment provision of the

pertinent social security statute and held that the DHMH did not assess charges against Ecolono in violation of state law.

## C. Contentions of the Parties

As discussed, the Juvenile Court concluded that the Department's actions in using Ryan's OASDI benefits to reimburse itself for the cost of his care violated his right to equal protection of the law; that its failure to provide Ryan with notice of its appointment as his representative payee violated Ryan's right to due process of law; and that the COMAR regulations permitting the Department to reimburse itself for the cost of Ryan's care were invalid. The Department argues that it acted "in accordance with the requirements of federal and state law when it expended [Ryan's OASDI benefits] for the costs of [his] foster care." In reliance on *Keffeler III,* the Department maintains that Ryan's equal protection challenge lacks merit because all foster children are treated identically under state and federal law. It also asserts that Ryan was not deprived of due process of law where, as here, the only notice required under governing federal law was notice to Ryan's representative payee and the Juvenile Court found that the SSA had sent notice to the Department in compliance with the federal regulations. Finally, the Department argues that the Court of Appeals in *Conaway* upheld the COMAR regulations that the Juvenile Court in this case declared to be invalid.

Ryan responds that the Juvenile Court correctly concluded that the Department's actions in taking his OASDI benefits without notice to him violated his due process rights; that the Department violated Maryland law by using his retroactive lump-sum social security benefit payments to reimburse itself for the cost of past and current care; and that the Department generally failed to comply with federal and state law by using his benefits to reimburse itself rather than conserving his benefits for future use at such time as he aged out of foster care.

## D. Compliance with State and Federal Law

█ It is plain that the Department acted in compliance with the Social Security Act and the regulations thereto when

it applied with the SSA to be representative payee for Ryan and, upon its application being granted, used the benefits received on Ryan's behalf to cover the cost of his current maintenance in foster care.[25] We explain.

When Ryan's parents died, he was under age 18 and did not meet the necessary criteria to receive OASDI benefits directly. 20 C.F.R § 404.2010(b). Therefore, he could receive OASDI benefits only through a representative payee. The federal regulations permit a local department of social services to act as a representative payee when, as here, no other alternative representative payee is available. 20 C.F.R. § 404.2021(c). As Ryan's representative payee, the Department, like any other representative payee, was obligated to apply the OASDI benefits received for Ryan first to cover the cost of his current maintenance. 20 C.F.R. § 404.2040. Those costs include food, shelter, clothing, medical care, and personal comfort items. *Id.* During the time the Department was acting as Ryan's representative payee, it was receiving $771 per month in OASDI benefits on his behalf. Exom testified that the Department reimbursed the group homes that were providing food, clothing, and shelter to Ryan between $5,000 and $6,000 a month, a sum that far exceeded the monthly OASDI benefit amount. After paying the $771 monthly OASDI benefit for Ryan's current maintenance, no excess remained. Accordingly, the Department was not under an obligation to "conserve or invest" any of Ryan's monthly OASDI benefits. *See* 20 C.F.R. § 404.2045(a) (requiring conservation and investment of benefits received by a representative payee when the benefits exceeded the cost of current maintenance and other authorized expenditures for the beneficiary).

---

**25.** As discussed, the Department concedes that it misapplied approximately $8,100 of Ryan's *retroactively paid lump sum* benefit payments. During oral argument in this Court, counsel for Department reemphasized that it concedes the amount and that that amount will be "restored" to Ryan after the Department's accounting division determines the precise amount of improperly applied benefits.

We find support for this conclusion in *Keffeler II* and *Conaway*. In *Keffeler II*, notwithstanding that the Supreme Court's primary concern was with whether the Act's anti-attachment provision barred the Washington DSHS's practice of using social security benefits to self-reimburse, it also addressed the plaintiff class's core argument that it was "antithetical to the best interest of the beneficiary foster child" to allow the practice. 537 U.S. at 389, 123 S.Ct. 1017. The Court soundly rejected this contention, emphasizing that the SSA Commissioner had interpreted the "interest" of the beneficiary "in light of the basic objectives of the Act: to provide . . . workers and their families the 'income required for ordinary and necessary living expenses.'" *Id.* at 390, 123 S.Ct. 1017 (quoting 20 C.F.R. § 404.508(a)). These objectives were served, according to the Commissioner, by using the child's OASDI benefits to pay for his or her basic, current needs, "not by maximizing a trust fund attributable to fortuitously overlapping state and federal grants." *Id.*

The Court of Appeals in *Conaway* has made clear that federal benefits received by a local department of social services on behalf of a foster child may be applied to cover the child's current cost of care. As explained above, the *Conaway* Court distinguished between the Department's prior practice of using a foster child's already conserved social security and veteran's benefits to reimburse itself for the prior cost of his care and its later adopted practice of using "current benefits for current costs of care." 298 Md. at 648, 471 A.2d 1058. While finding the prior practice to violate the anti-attachment provision of the Act, the Court held the latter practice to be appropriate and fully in compliance with federal law and state regulations. In so concluding, the Court explicitly addressed the authority for COMAR 07.02.11.07, now COMAR 07.02.11.29L. That regulation permits local departments of social service to use a foster child's resources, including OAS-DI benefits, to reimburse itself for the cost of the child's present care. As the Court explained:

[T]he State followed the procedure outlined in COMAR 07.02.11.07. Furthermore, the relevant statute authorizes

the procedure as having the force of law. Article 88A, § 5(a) provides that the State Director of Social Services may "adopt from time to time such rules and regulations as may be necessary to carry out any of the duties imposed upon him by law, and when adopted, . . . such rules and regulations shall have the force and effect of law." Article 88A, § 60 authorizes various payment rates for foster care; however, it does not delineate the source(s) of the funds to be used. The State Director of Social Services is responsible for administering these aspects of the foster care program. Therefore, regulations about foster care payment rates and the source of funds to make these payments are necessary to carry out duties imposed by law. The regulation at issue in this case has accomplished precisely that. COMAR 07.02.11.07 is entitled "Resources for Reimbursement towards Cost of Care." Federal benefits were paid to the State and could have been used to pay for the cost of the child's care. These benefits were committed to the department for the child's benefit. *As resources that could offset the cost of care, their use was a proper subject for regulation. Because these regulations were within the statutory authority, they had the force of law; thus, they provided an adequate legal basis for the local department's actions.*

*Id.* at 644, 471 A.2d 1058 (emphasis added). In the instant case, the Juvenile Court declared two subsections of the current version of this regulation, COMAR 07.02.11.29, invalid based on its conclusion that the regulation exceeded the DHR's statutory authority. That conclusion clearly is at odds with *Conaway,* and is legally incorrect.[26]

---

26. In its June 16, 2011 opinion, the Juvenile Court declared COMAR 07.02.11.29K(2) and COMAR 07.02.11.29L invalid. COMAR 07.02.11.29(L) provides that a foster child's "resources," which, as discussed, include OASDI benefits,

> shall be applied directly to the cost of care, with any excess applied first to meeting the special needs of the child, and the net excess saved in a savings account for future needs. Any potential benefits from other resources shall be pursued and made available if possible to the local department as payee.

Ryan also contends that *Conaway* prohibits the use of *any* of his lump sum benefit payments to reimburse for "past care," and that the Department used funds in that manner over and above the concededly misapplied amount. The *Conaway* opinion did not address lump sum retroactive benefit payments, however. It addressed only the propriety of using voluntarily conserved benefits to self-reimburse for past care. Here, none of the lump sum benefits were conserved and thus *Conaway* is inapposite. Moreover, *Ecolono* lends support to the Department's practice of applying lump sum retroactive benefit payments for the cost of care for the month in which the lump sum is received, and the prior month. *See* 137 Md.App. at 643–44, 769 A.2d 296 (describing the accounting and application of Ecolono's lump sum benefits). Ryan does not point to any other authority to support his argument that the use of a lump sum payment for "current maintenance" expenses incurred in the prior month would violate the Social Security Act, and we have found none.

Alternatively, Ryan maintains, in reliance upon *Ecolono,* that, even assuming that state and federal law permitted the Department to use his OASDI benefits for the cost of his care, the Department failed to exercise any discretion in deciding how to use his OASDI benefits, and thereby violated federal law. As we understand it, he argues that, had the Department given consideration to his individual needs, it would have chosen to conserve his OASDI benefits every month, so he would accumulate a resource he can use when he ages out of foster care, instead of choosing to use the benefits to pay for

---

It was in keeping with this authority that the Department applied to act as Ryan's representative payee and used Ryan's OASDI benefits to cover a small portion of the cost of his care. COMAR 07.02.11.29(K)(2) directed that, if a foster child over age 18 is in an out-of-home placement and is the beneficiary of OASDI benefits, the child may choose whether to receive the benefits directly and "pay the local department" or "[d]esignate the local department as the payee." This regulation was not implicated in Ryan's case as he was under 18 when the Department became his representative payee and, in any event, during proceedings before the Juvenile Court, a Department witness testified that the regulation is not enforced.

the cost of his current care. He points to testimony from Youngblood that conservation of a foster child's resources is in the child's best interest when the child is preparing to transition to independence. He also argues that his poor school performance showed that he had special educational needs and that the Department could (and should) have exercised its discretion to use a portion of his OASDI benefits to provide additional services in that area.

The Department responds that *Ecolono* is distinguishable on its facts because, in that case, there was evidence that the State had applied a portion of a retroactive lump sum benefit payment to cover the cost of Ecolono's care when his treatment team had recommended to the contrary. As discussed, the lump sum payment had been received from the SSA the month before Ecolono was to be released from State care and, as permitted by federal regulations, the State had used a portion of those benefits to self-reimburse for the cost of care. Ecolono's release from State care was predicated upon his ability to become self-supporting within 90 days and to abstain from drugs and alcohol. Ecolono's treatment team had taken into account his imminent receipt of social security benefits in making its release recommendation. In that context, this Court held that the State's failure to exercise any discretion before it applied a portion of his social security benefits to the cost of his care was impermissible, and remanded for discretion to be exercised. We also emphasized, however, that had the State exercised discretion to do precisely what it did, *i.e.*, to use the funds to cover the cost of care, we would not have found any abuse.

In the case at bar, the Juvenile Court did not find that the Department failed to apply the benefits to meet Ryan's needs; in fact, the Juvenile Court assumed that the Department did so. Rather, the court concluded that it would have been in Ryan's best interests to instead conserve those funds for his future use. We do not understand *Ecolono* to stand for the proposition that a State agency acting as representative payee for a beneficiary in its custody always must exercise discretion to consider whether conservation of benefits would better

serve the beneficiary's interests. Under the federal regulations, conservation of benefits is explicitly provided for *only after* a representative payee has provided for the beneficiary's current maintenance and other permissible uses. *See* 20 C.F.R. 404.2045. And, as discussed, use of benefits by a representative payee to cover a beneficiary's current maintenance costs is deemed to be a proper expenditure made in the interest of the beneficiary. *See* 20 C.F.R. 404.2040(a). Thus, the discretion that must be exercised is the discretion to apply benefits among the various current maintenance needs of the child, not the discretion to use or conserve the benefits.

Moreover, unlike in *Ecolono,* where the beneficiary patient's release from State custody was imminent at the time the State received a lump sum benefit payment on his behalf and applied the payment toward the cost of care, here, in contrast, the Department began receiving OASDI benefits on Ryan's behalf when he was 16 years old, a full five years before he would age out of the system, and ceased receiving them on his behalf when he turned 18. During that time, the Department expended between $5,000 and $6,000 *per month* on Ryan's care—an amount far exceeding the monthly OASDI benefit—and exercised discretion constantly with respect to the appropriate placements and services for him. There was no evidence that Ryan, his CINA attorney, or Exom ever made known to the Department an unmet need of Ryan.[27] On the contrary, there was ample evidence before the Juvenile Court that the Department provided intensive services for Ryan during his commitment, including 24–hour therapeutic and non-therapeutic supervision and care in group homes, drug treatment, food, clothing, summer school, and tutoring (a service that Ryan acknowledged not taking advantage of). As Ryan's benefits never exceeded the cost of his current maintenance expenses, we conclude that the benefits were properly expended under federal and state law.

---

**27.** Ryan testified that he complained to employees at his group home about a delay in obtaining his state identification card. He acknowledged that he never brought this issue to Exom's attention.

### E. Equal Protection

█ We now turn to Ryan's argument, accepted by the Juvenile Court, that the Department's practice of applying to become representative payee of last resort for foster children and then using their social security benefits to reimburse itself for the cost of the children's care had the effect of creating two distinct classes of foster children receiving social security benefits: those with a private representative payee and those with a Department representative payee. Given the Department's acknowledgment that it did not seek reimbursement from private representative payees for the cost of foster children's care, the Juvenile Court concluded that a foster child with a private representative payee would be able to conserve his or her social security benefits, rather than having those benefits applied to the cost of the child's foster care services. According to the Juvenile Court, this constituted discriminatory treatment in violation of the equal protection clause of the 14th Amendment of the Federal constitution and Article 24 of the Maryland Declaration of Rights.[28]

This identical argument was presented to and rejected by the Washington Supreme Court in *Keffeler III* and we are persuaded by that court's reasoning. As discussed, the *Keffeler III* court concluded that the identity of the representative payee for a foster child who is receiving social security benefits does not have the effect of creating two distinct classes of foster children beneficiaries. This is so because "there are not two groups of foster children but one group: all foster chil-

---

**28.** Article 24 of the Maryland Declaration of Rights provides:

That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

While Article 24 does not contain an explicit equal protection clause, the Court of Appeals has held that one is "embodied within the Article." *Frey v. Comptroller of the Treasury*, 422 Md. 111, 134 n. 13, 29 A.3d 475 (2011). As a general rule, the equal protection and due process clauses of Article 24 are construed *in pari materia* with their federal counterparts. *Tyler v. City of College Park*, 415 Md. 475, 499, 3 A.3d 421 (2010).

dren receiving social security benefits with appointed representative payees," and because *"all representative payees* must use the benefits according to state and federal laws and regulations." 88 P.3d at 953 (emphasis in original). Under the regulations set forth above, a foster child's representative payee must first apply any benefits received to the child's current maintenance and reasonably foreseeable needs. "Then, only after the cost of care and reasonably foreseeable needs are provided, may the benefits be conserved or invested." *Id.* at 954 (citing 20 C.F.R. §§ 404.2045(a), 416.645(a) (2003)). Thus, while the *Keffeler III* court noted that the anti-attachment provision of the pertinent parts of the Social Security Act would prevent a state from seeking reimbursement from a private representative payee for the cost of a foster child's care, if a private representative payee was "not using the benefits for the child's cost of care and reasonably foreseeable needs, this may violate federal regulations and the Commissioner may remove the representative payee." *Id.* (citing 20 C.F.R. §§ 404.2050, 416.650 (2003) (footnotes omitted)).

■■ Even if we were to agree with Ryan that the Department's practice of reimbursement effectively created two classes of foster children (which we do not), we nonetheless would uphold the constitutionality of its practice. In assessing challenges under the Equal Protection Clause, "unless a suspect or quasi-suspect class is created ..., the appropriate standard of review of constitutionality is whether there is a rational basis for the created class...." *Rios v. Montgomery County*, 386 Md. 104, 121, 872 A.2d 1 (2005). Ryan does not assert that foster children or, more precisely, foster children for whom the Department acts as representative payee, constitute a "suspect" or "quasi-suspect" class. *See, e.g., Conaway v. Deane*, 401 Md. 219, 277–78, 932 A.2d 571 (2007) (discussing characteristics of suspect and quasi-suspect classes); *Gean v. Hattaway*, 330 F.3d 758, 771 (6th Cir.2003) (no "suspect class" implicated in challenge by delinquent youth to Tennessee Department of Children's Services's practice of using social security benefits to self-reimburse for the cost of

care). Thus, if the alleged legislative classification bears a rational relationship to some legitimate governmental interest, it is constitutional. *Tyler, supra,* 415 Md. at 501, 3 A.3d 421. In *Gean, supra,* the Court of Appeals for the Sixth Circuit easily concluded that the Tennessee Department of Children's Services ("DCS") had a rational basis for distinguishing between two classes of delinquent youth in State operated live-in treatment facilities—those receiving social security benefits (and for whom the DCS was acting as representative payee) and those with no source of income—and for using benefits received on behalf of the former class to self-reimburse. The court explained, quite reasonably, that Tennessee has "an interest in saving money and obtaining funds, where legally possible, to pay for the large number of social services it provides its residents." 330 F.3d at 771.

Here, the Department's practice plainly has a rational basis in that it comports with federal regulations governing the use of social security benefits by a representative payee and with state regulations that require that all of a foster child's resources are to be used, first and foremost, to cover his or her cost of care. As in *Gean,* these practices serve the legitimate governmental purpose of decreasing a state's costs associated with foster care. In the instant case, the Department expended well over $200,000 on Ryan's care and supervision during the period of time that he received the $31,693.30 in OASDI benefits. The Department's practice of using the OASDI funds to reimburse itself for the cost of Ryan's current maintenance did not run afoul of the Equal Protection Clause.

## F. Procedural Due Process

■ The Juvenile Court also concluded that the Department's failure to notify Ryan's CINA attorney of its appointment as Ryan's representative payee and/or of its receipt of benefits on Ryan's behalf deprived Ryan of due process of law. The Juvenile Court quoted extensively from the provision of the Social Security statute governing notice of the appointment of a representative payee. That statute provides in relevant part:

(ii) In advance of the certification of payment of an individual's benefit to a representative payee under paragraph (1), the Commissioner of Social Security shall provide written notice of the Commissioner's initial determination to certify such payment. Such notice shall be provided to such individual, except that, if such individual—. . . (II) is an unemancipated minor under the age of 18 . . . then such notice shall be provided solely to the legal guardian or legal representative of such individual.

42 U.S.C. 405(j)(2)(E). *See also* 20 C.F.R. 404.2030(a) (explaining that if a beneficiary is an "unemancipated minor under the age of 18" written notice of the appointment of a representative payee "goes to [the beneficiary's] legal guardian or legal representative").

The Juvenile Court acknowledged that Ryan, an unemancipated minor when the payments started, "appear[ed] to fall into one of the notice exceptions under the statute." Nevertheless, the court concluded that the Department had an independent obligation to give notice of its appointment as Ryan's representative payee to his CINA counsel. The court reasoned that this duty derived from language in the same statute that mentions notice to a beneficiary's "legal representative" as an *alternative* to notice to a beneficiary's "legal guardian." The court admonished the Department for not disclosing its status as Ryan's representative payee during any of the permanency plan review hearings.

Putting aside the important fact that the Commissioner, not the Department, was obligated to provide notice of the appointment, the Juvenile Court's conclusion finds no support in the SSA statute or regulations. Both section 405(j)(2)(E) and the regulation implementing it are phrased in the disjunctive, requiring notice *either* to a minor's "legal guardian" *or* to a "legal representative." Here, the Commissioner provided notice to the Department, which was Ryan's legal guardian. This is all the Commissioner was required to do. We perceive no due process violation under the facts of this case.

## III.

### Jurisdiction of the Juvenile Court

■ The Department advances an alternative contention that the Juvenile Court lacked the authority to declare CO-MAR regulations invalid, to supervise the Department's actions as Ryan's representative payee, and to fashion an equitable remedy to address the assertedly improper use of Ryan's benefits. We have concluded that the Department's practice of self-reimbursement complied with federal and state law and that the COMAR regulations authorizing its practice are valid. It follows that no equitable remedy was necessary because there was no wrong to be corrected. We agree with the Department, however, that the Juvenile Court is not, as Ryan argues, vested with broad equitable powers to supervise the Department when it is acting in its role as representative payee for foster children committed to its care.

■ The juvenile courts are "statutorily created courts of limited jurisdiction" that only may exercise "those powers expressly designated by statute." *Smith v. State*, 399 Md. 565, 574, 924 A.2d 1175 (2007). There is " '[n]o principle [ ] better established than that in exercising a statutory power, a court is without jurisdiction unless it complies with the statute.' " *In re Franklin P.*, 366 Md. 306, 333, 783 A.2d 673 (2001) (quoting *Austin v. Director of Patuxent Inst.*, 245 Md. 206, 209, 225 A.2d 466 (1967)), in turn quoting, *Scherr v. Braun*, 211 Md. 553, 563, 128 A.2d 388 (1957); *see also In re Glenn S.*, 293 Md. 510, 515, 445 A.2d 1029 (1982) (juvenile court is a court of special jurisdiction and may only exercise those powers specifically granted it by statute); *In re John F.*, 169 Md.App. 171, 181–82, 899 A.2d 976 (2006) (emphasizing that while the juvenile court's subject matter jurisdiction may be presumed where it exercises jurisdiction over a child, its authority to act in a CINA proceeding is constrained by its "statutorily enumerated powers").

■ The vehicle for relief that was used in this case—a motion to control conduct—is not a means by which a Juvenile

Court may expand its statutorily enumerated powers. *See* CJP § 3–821. Here, the Juvenile Court purported to act under its broad authority to protect and advance the best interests of foster children and, more specifically, in keeping with its statutorily enumerated authority over "support" of children declared CINA. *See* CJP § 3–803(b)(1)(i). In his motion to control conduct, Ryan did not seek an order directing a party to pay child support, nor did he allege that he was not receiving support payments to which he was entitled. Rather, he sought to challenge the Department's use of benefits it had received on his behalf as his duly appointed representative payee. Even if "support" of a child declared CINA could be understood to encompass OASDI benefits properly received by the Department under a federal regulatory scheme, that would not mean that the Juvenile Court has plenary equitable powers to order the Department to place monies already collected and disbursed in a trust for the benefit of the CINA.[29] Accordingly, even if we had not already concluded that such a remedy is not warranted under the facts of this case, we would nonetheless conclude that the Juvenile Court exceeded its authority by imposing a constructive trust.

## IV.

### Sovereign Immunity

Finally, the Department asserts that the remedy imposed by the Juvenile Court—creation of a constructive trust—is barred by sovereign immunity. It argues that any claim against the Department for damages for monies already spent must proceed under the MTCA. For the reasons already discussed, we conclude that the Department acted properly in applying Ryan's benefits to reimburse itself for the cost of his

---

**29.** We note that the two Maryland cases challenging the State's use of social security benefits for self-reimbursement both were raised in the context of administrative actions; that forum properly is suited to address the Department's enforcement of valid COMAR regulations permitting the practice of self-reimbursement with OASDI benefits. *See Conaway, supra,* and *Ecolono, supra.*

care, and that, even if the Juvenile Court had the power to impose a constructive trust, which it did not, a trust was not warranted. Accordingly, we need not decide whether sovereign immunity barred such a remedy.[30]

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY, SITTING AS THE JUVENILE COURT, WITH DIRECTIONS TO ENTER AN ORDER DIRECTING THE BALTIMORE CITY DEPARTMENT OF SOCIAL SERVICES TO DEPOSIT IN RYAN W.'S FOSTER CARE TRUST ACCOUNT $660 IN REIMBURSEMENT OF OASDI BENEFITS RE-**

---

**30.** As discussed above, in footnote 1, before the Juvenile Court, counsel for the Department conceded that, of the $31,693.50 that the Department received in OASDI benefits for Ryan, $8,075.32 should have been conserved for Ryan, in a Foster Care Trust Account: $7,415.32 of the lump sum retroactive OASDI benefits and $660 that was the difference between the actual cost of care for Ryan in May 2010 and the amount received in OASDI benefits that month. The parties acknowledge that this was simply a mistake by the Department. According to the Department's motion for reconsideration, $7,478.32 was deposited by it into Ryan's Foster Care Trust Account in December 2011, to credit him for those portions of the OASDI lump sum retroactive payments that the Department concededly was not permitted to use to reimburse itself for the cost of Ryan's care. For reasons not explained, the deposited sum is $63 more than the amount counsel conceded was owed by the Department to Ryan from the OASDI lump sum retroactive payments. We assume that the amount conceded by the Department's counsel was mathematically incorrect, as the affidavit of the Department's Assistant Director of Finance submitted with the Department's motion for reconsideration details how the $7,478.32 sum was calculated.

The motion for reconsideration and supporting affidavit do not address the $660 in OASDI overpayment that counsel for the Department conceded should have been conserved for Ryan in his Foster Care Trust Account based on the overpayment for May 2010. (In his opposition to the Department's motion for reconsideration, Ryan W. does not address the substance of the motion, but merely rehashes the arguments advanced in his brief.) Thus, the Department remains obligated to conserve an additional $660 for Ryan W., by placing that sum in his Foster Care Trust Account.

We emphasize that in these circumstances the $660 that the Department must deposit into Ryan W.'s Foster Care Trust Account does not constitute tort damages that must be sought pursuant to the MTCA. The money is in the hands of the Department, which received it from the SSA, and must be reimbursed to Ryan, as the Department was obligated by law to conserve it for him.

CEIVED BY THE DEPARTMENT IN ITS FORMER CA-
PACITY AS REPRESENTATIVE PAYEE FOR RYAN W.
COSTS TO BE PAID ONE–HALF BY THE BALTIMORE
CITY DEPARTMENT OF SOCIAL SERVICES AND
ONE–HALF BY RYAN W.